WILLIAM R. POWERS, Appellant/Cross-Respondent, v.
UNITED SERVICES AUTOMOBILE ASSOCIATION
and USAA CASUALTY INSURANCE COMPANY,
Respondents/Cross-Appellants.

No. 26794

July 16, 1998                                    962 P.2d 596

*Brenske & Christensen,* Las Vegas; *Raleigh, Hunt & McGarry,*
Las Vegas, for Appellant/Cross-Respondent.

*Beckley, Singleton, Jemison & List* and *Daniel F. Polsenberg,*
Las Vegas; *Pearson & Patton,* Las Vegas; *Howard, Moss,
Loveder, Strickroth & Walker,* Santa Ana, California, for
Respondents/Cross-Appellants.

*Bradley, Drendel & Jeanney,* Reno, for Amicus Curiae Nevada
Trial Lawyers Association.

## OPINION

By the Court, Rose, J.:

Retired Air Force Colonel William Powers lived on his boat, the "Mikimbi." On April 28, 1987, en route from Texas to Florida through the Gulf of Mexico, the Mikimbi sank. On May 2, 1987, Powers reported his loss to USAA, his insurer for thirty-five years. After USAA commenced its investigation, it accused Powers of intentionally sinking his own boat. On December 14, 1987, eight months after the Mikimbi sank, USAA denied Powers' claim. In May 1989, USAA instigated criminal charges against Powers for pursuing an allegedly false insurance claim, including wire fraud and mail fraud. At trial, Powers was acquitted.

Powers then brought a civil action against USAA based on its conduct in handling his claim. A jury found that USAA acted in bad faith in failing to pay Powers' claim, in breach of its fiduciary relationship with Powers, and had breached the insurance contract. The jury awarded Powers special, compensatory, and punitive damages; however, the district court denied Powers' motion to amend the judgment to include post-judgment interest on the punitive damages.

Powers appeals the denial of his motion regarding post-judgment interest on punitive damages; USAA now cross-appeals the judgment. We affirm the jury's verdicts and conclude that Powers was entitled to interest on the punitive damage award as of the date the judgment was entered.

### *FACTS*

Retired Air Force Colonel William Powers lived on his boat,

the "Mikimbi." On the afternoon of April 28, 1987, en route from Texas to Florida through the Gulf of Mexico, Powers fell asleep aboard the Mikimbi. He awoke to the odor of smoke and went below to find water entering the engine room. The water was above his ankles. Powers noticed that an exhaust hose had disconnected from the engine so that fumes and sea water were being pumped into the engine room. He attempted to save his boat, unsuccessfully trying to reattach the hose and to close a gate valve at the thru-hull, which was frozen in the open position.

Powers felt extremely sick and confused from inhaling engine room fumes and carbon monoxide. He vomited a few times from his exertion and the fumes. In a panic, he finally stopped the water from continuing to siphon into the boat by cutting the hose at the valve near the thru-hull. Water was still coming into the boat because it was leaning to the port side with the thru-hull below sea level. Powers stuffed a sheet into the thru-hull, temporarily stopping water from entering the boat.

Powers then called the U.S. Coast Guard for help, and boarded a life raft with a few provisions. At the direction of the Coast Guard, a commercial fishing boat, captained by Richard Underwood, rescued Powers. After resting aboard the fishing boat, Powers re-boarded the Mikimbi in an attempt to save it. He found that the sheet previously stuffed into the thru-hull had come out, and more water had entered the boat. He stuffed more rags into the opening. At approximately 6:55 p.m., Powers informed the Coast Guard that the leak was under control. The Coast Guard parachuted an emergency water pump to Powers, who spent thirty minutes unsuccessfully attempting to retrieve the pump from the ocean. Powers then experienced chest pains. The Coast Guard insisted that Powers abandon his boat.

After Powers left, no one attempted to board the Mikimbi. The boat continued to take on water, and eventually sank at 11:30 that night. A Coast Guard helicopter flew Powers to land, where an ambulance took him to a nearby hospital. When his blood was tested at 12:30 a.m., it showed the presence of (1) carbon monoxide from breathing fumes and (2) elevated enzymes from muscle damage due to physical exertion. He spent the night in the intensive care unit and left the hospital the next day against medical advice. USAA never reviewed Powers' medical records during its investigation of his claim.

On May 2, 1987, four days after the Mikimbi sank, Powers reported his loss to USAA, his insurer for thirty-five years. He believed that the woman to whom he described the incident did not understand his explanation of events. USAA then decided to assign Powers' case to its "Claims Security Unit" (CSU), which investigates fraud. Wayne McNeely, a CSU special investigator,

was designated as the chief investigator of Powers' claim. In his May 1987 telephone conversation with McNeely regarding the sinking of the Mikimbi, Powers stated that the exhaust hose had "deteriorated" at the thru-hull. He used the term "deteriorated" to simplify his explanation (McNeely had no expertise in marine investigations), and because he was concerned that USAA would automatically deny his claim if he explained that he had deliberately cut the hose.

Although McNeely testified that at this point in the review of the claim, he had no reason to believe that Powers had intentionally sunk the Mikimbi, USAA began to investigate Powers' finances looking for motive to file a fraudulent claim. In July 1987, two months after the Mikimbi sank, frustrated with USAA's failure to pay his claim, Powers telephoned McNeely to explain how and why he had cut the exhaust hose. USAA decided to raise the Mikimbi from the ocean. Powers asked USAA to allow him to be present when the boat was raised and brought into port. USAA refused Powers' request. At the end of September 1987, USAA raised and surveyed the Mikimbi outside of Powers' presence.

USAA had hired a local salvager, Harry Davis, to oversee the raising and investigation of the Mikimbi, notwithstanding Davis' lack of training as a marine investigator. Although Davis had told USAA that the boat could be raised at a cost of approximately $30,000, the actual cost to USAA of raising the Mikimbi (which involved numerous failed attempts) exceeded $200,000—a cost approximately double the amount for which the Mikimbi had been insured. Don Wimberly, district manager of the CSU, wrote in an October 27, 1987 internal USAA memo that "Davis has completely misled us all for his own purposes on the cost of the [Mikimbi] project."

USAA also allowed Davis to interview Captain Underwood— the only witness to the Mikimbi sinking who USAA interviewed. Davis recorded this interview on an audio tape; however, there was evidence that only selected portions of Captain Underwood's statement were recorded. USAA failed to produce this tape at trial. USAA did not interview any other witnesses to the sinking of the Mikimbi. On October 2, 1987, Davis made a videotape of the Mikimbi, purportedly depicting the contents of the boat at the time it was raised. At trial, Davis admitted that his videotape was a "re-creation" and that he had moved items allegedly found on the boat for purposes of the videotape. On the tape, Davis held up a pipe wrench which he alleged had been found near the thru-hull and could have been used to shut the frozen gate valve. Powers maintained that no such wrench had been present on his boat at the time of sinking. At trial, Powers' expert witness—a metal-

lurgist—testified that the wrench depicted in the videotape did not show corrosion consistent with having been submerged on the boat in ocean water for five months. In any event, USAA failed to produce the wrench for analysis by Powers' expert.

The videotape also depicted an "adaptor kit"—a large hose and two clamps which purportedly could have been used by Powers to repair the hose at the thru-hull. Again, Powers denied having had these items on his boat when it sank, and his expert testified that the condition of the clamps indicated that they had not been submerged in ocean water for five months. At trial, McNeely admitted that even had it been present on the Mikimbi, the "adaptor kit" would not have enabled Powers to repair a cut hose.

While investigating the Mikimbi, McNeely took numerous photographs of its interior. Powers told USAA that he had left almost all of his possessions on the Mikimbi and that various items had been stored in a cabinet above the stove. The cabinet consisted of three separate doors but only one un-partitioned cabinet. The McNeely/Davis inspection revealed that the cabinet was empty—supposedly evidence that Powers had removed all of his belongings before intentionally sinking his boat. McNeely's photographs showed two of the three doors which were latched closed. However, no pictures were taken of the third door which had a broken latch and open door through which the cabinet contents could have fallen out during the numerous attempts to raise the boat.

The videotape and photographs also showed that hoses from the toilet and the raw water intake pump had been disconnected. Davis told McNeely that these hoses could have been intentionally disconnected as a means of sinking the boat. However, Powers maintained that water would not enter the boat if those hoses were disconnected—he explained that one of the hoses simply took waste from the toilet to a holding tank. McNeely never investigated these inconsistent positions and adopted Davis' conclusions.

In mid-October, USAA asked Powers to submit to an examination under oath; Powers complied. At this examination, Powers reiterated the manner in which the boat had sunk; his testimony was consistent with the information he had provided to McNeely in July, prior to the raising of the Mikimbi. Shortly after this examination, Powers asked USAA to seal the Mikimbi and allow the Coast Guard to perform an independent examination of its condition. USAA refused and left the boat and its contents in Davis' custody.

On November 9, 1987, McNeely submitted his closing report in which he stated that the toilet and raw water intake hose had

been disconnected, causing the boat to take on water. The report concluded that Powers had intentionally sunk the Mikimbi. Notwithstanding the fact that McNeely had no expertise in the investigation of boat sinkings, he admitted that he never attempted to confirm Powers' contention that a siphon had occurred on the boat. The Mikimbi's designer, William Crealock, testified in the instant case that a siphon could have occurred in the manner described by Powers.

McNeely concluded his report by stating that the investigation would be forwarded to the Insurance Crime Prevention Institute (ICPI)—an entity funded by insurance companies which investigates claims and refers cases to the FBI for possible criminal prosecution. On December 14, 1987, eight months after the Mikimbi sank, USAA denied Powers' claim. The letter denying the claim stated that "false swearing, concealment or misrepresentation of any material fact" voided the insurance policy.

The ICPI forwarded Powers' USAA file, including USAA's conclusions, to the FBI. In May of 1988, an FBI investigator contacted McNeely. The federal investigator told McNeely that the disconnected hoses to which USAA had attached great significance, could have become disconnected during the numerous attempts to raise the Mikimbi. In May 1989, the FBI contacted Powers. When Powers and his wife arrived at the FBI for an interview, he was arrested. The U.S. Attorney's Office filed criminal charges against Powers for pursuing an allegedly false insurance claim, including wire and mail fraud.

The federal trial commenced in March 1991. Davis testified in front of a federal grand jury and again at the federal trial; he was compensated by USAA on both occasions. At the federal trial, Davis presented the gate valve from the Mikimbi and demonstrated to the jury that it was not frozen. However, Powers' defense included the testimony of a metallurgist who concluded that the valve had been tampered with after the Mikimbi had been raised as there was lubricant on the valve which would not be present after five months in ocean water.

A federal jury acquitted Powers on all charges. Notwithstanding Powers' acquittal of criminal wrongdoing, USAA stood by its denial of his claim. Moreover, USAA continued to investigate the case and attempted to establish that Powers had hired Captain Underwood to sink the Mikimbi. USAA eventually abandoned this subsequent investigation, but still maintained that its denial of Powers' claim was justified based upon his alleged "material misrepresentations."

Just prior to his arrest in connection with the federal charges, Powers had filed the instant case against USAA alleging six causes of action: (1) breach of contract, (2) bad faith failure to

pay Powers' claim, (3) breach of fiduciary relationship, (4) malicious prosecution, (5) intentional infliction of emotional distress, and (6) violation of the Unfair Claim Settlement Practices Act. A jury found in Powers' favor on the first three causes of action, rejected the final three causes of action, and awarded him special, compensatory, and punitive damages. However, the judgment did not award Powers post-judgment interest on the punitive damages.

Powers appeals on the ground that the district court erred in failing to award post-judgment interest on his punitive damages award; USAA cross-appeals the judgment awarding Powers compensatory and punitive damages.

## DISCUSSION[1]

*The district court did not err in allowing the jury to determine whether Powers' misrepresentation was material*

Powers initially told USAA that the exhaust hose aboard the Mikimbi had "deteriorated." Two months later, he told USAA that he had cut the hose. The USAA policy insuring the Mikimbi contained the following provision: "False swearing, concealment or misrepresentation of any material fact by any covered person voids this policy." At trial, Powers admitted that he had misrepresented the detachment of the hose because he was worried that USAA would summarily deny his claim. USAA asserts that this misrepresentation was material as a matter of law and that it was error to permit the jury to decide the issue of materiality. We disagree.

Under most circumstances involving misrepresentations by an insured to an insurance company, it is "a question of fact for the jury to decide whether the variance between the representation and the existing facts was material." Gerhauser v. N. B. & M. Ins. Co., 7 Nev. 174, 196 (1871). "The rule is well established that, if the materiality of the representations or statements depends upon inferences to be drawn from facts and circumstances proved, the question of materiality is one for the jury." Smith v. N. A. A. I. Co., 46 Nev. 30, 43, 205 P. 801, 804 (1922). In both *Gerhauser* and *Smith* the materiality issue arose with respect to false statements made in insurance applications. It

---

[1]NRAP 28(h) designates the plaintiff below as the appellant, and the defendant below as cross-appellant, unless otherwise ordered. If we were to reverse Powers' damages award on USAA's cross-appeal, Powers' issue on appeal concerning post-judgment interest would be moot. Accordingly, this opinion will first address the issues on cross-appeal, i.e., the validity of Powers' damages award.

was acknowledged in *Smith,* that materiality could be judged as a matter of law in cases where the parties' contract stipulated that certain facts were to be considered material; however, where "materiality must be shown by matters outside the terms of the contract, it is a question of fact." 46 Nev. at 45, 205 P.2d at 805.

Unlike the situation in *Gerhauser* and *Smith,* the deception here relates to the claims process rather than to the application process, and it is only in the rarest of cases of this kind that the materiality issue can be taken from the jury. Further reluctance to remove this issue from the jury is fostered by reason of the fact that in this case a jury has already ruled on the issue and in Powers' favor. As put in *Gerhauser,* the issue is whether there is a *material* "variance between the representation and the existing facts." 7 Nev. at 196. Under our cases, then, it is the jury that must decide whether the false representation, that is, the "variance between the [false] representation and the existing [true] facts, is *material,"* which is to say, substantially related to or, as put in the jury instruction, "reasonably relevant to the insurance company's investigation."

We conclude that in this case whether Powers' misrepresentation was material was a question of fact to be properly decided by a jury. USAA was not entitled to a determination that materiality was present in this case as a matter of law.

*There was substantial evidence upon which the jury could have reasonably concluded that Powers' misrepresentation was not material*

A jury's verdict will not be overturned if it is supported by substantial evidence unless the verdict was clearly erroneous when viewed in light of all the evidence presented. Bally's Employees' Credit Union v. Wallen, 105 Nev. 553, 779 P.2d 956 (1989). We conclude that there was substantial evidence upon which the jury could have determined that Powers' misrepresentation was not material.[2]

The jury was instructed that: " A fact is material if it concerns a subject reasonably relevant to the insurance company's investigation, and if a reasonable person would attach importance to that fact. A representation is false when the facts fail to correspond

---

[2]We reach this same conclusion and apply the same reasoning with regard to USAA's assertions that Powers' alleged initial concealment of the fact that the exhaust hose slipped off the engine manifold and that his failure to mention a siphon effect in his May 1987 conversation with McNeely were material. We note that the purported inconsistencies in Powers' recounting of relevant events were presented to the jury.

with its assertions." Stated another way, a misrepresentation is material "if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding." Pacific Indem. Co. v. Golden, 985 F.2d 51, 56 (2d Cir. 1993). To be deemed a material misrepresentation, it must be shown that an insurer's "investigation would have proceeded differently had" the insured told the truth. *Id.* at 56-57.

In the instant case, there was ample evidence upon which the jury could have concluded that USAA's investigation of Powers would not have proceeded differently had he stated in May 1987 that he had cut the exhaust hose. Wimberly testified that he was suspicious of Powers' claim from the onset due to the fact that the Mikimbi sank in calm waters. According to McNeely, USAA had decided to raise the Mikimbi prior to Powers' telephone call in July 1987 wherein he explained that he had cut the exhaust hose. Following this conversation, USAA proceeded with its plans to raise the boat.

Furthermore, the jury could have easily concluded, based on the evidence, that the fact that the exhaust hose was cut rather than deteriorated was not "reasonably relevant" to USAA's investigation. USAA's investigation focussed on the manner in which the Mikimbi sank. The boat's designer, William Crealock, testified that it was the fact that the exhaust hose slipped off of the engine manifold, combined with the fact that the valve at the thru-hull could not be closed, that caused the Mikimbi to take on water. The condition of the hose at the thru-hull (i.e., cut *or* deteriorated) was not a relevant factor in the sinking of the boat.

We conclude that based upon substantial evidence, the jury could have found, applying the definition of materiality contained in Instruction No. 14, that Powers' May 1987 misrepresentation was not material so as to void his policy.[3]

---

[3] We reject USAA's contention that the district court erred in overruling USAA's objections to the expert testimony on the issue of materiality. The admission of expert testimony lies within the sound discretion of the district court. *Cf.* Prabhu v. Levine, 112 Nev. 1538, 1547-48, 930 P.2d 103, 101-10 (1996). NRS 50.275 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify to matters within the scope of such knowledge." Moreover, NRS 50.295 permits an expert to give opinion testimony concerning the ultimate issues in a case. We conclude that the district court did not abuse its discretion in permitting experts for both USAA and Powers to testify as to the materiality of the misrepresentation at issue.

*The jury was properly instructed that the relationship between USAA and Powers was fiduciary in nature; the jury could have properly found that USAA breached its fiduciary duty to Powers*

Powers argued that USAA breached a fiduciary responsibility to him by refusing Powers' requests (1) for copies of photographs Powers had been shown at the October 1987 examination under oath; (2) to be present when the Mikimbi was raised and not telling him where the boat was until three days after USAA had possession; and (3) to seal the Mikimbi to protect evidence Powers needed to defend against allegations that he had intentionally sunk his boat.

USAA contends that, while an insurer's duty to an insured can be "akin" to that of a fiduciary in some respects, the insurer has no fiduciary duty to pay questionable claims. *See* Employers Insurance Co. of Wausau v. Albert D. Seeno Construction, 945 F.2d 284 (9th Cir. 1991). USAA contends that imposing a fiduciary duty to a first-party insured would require insurance companies to pay every claim presented by an insured. USAA argues that an insurance carrier owes a duty to its other policyholders not to dissipate its reserves by paying meritless claims. We are not persuaded by these arguments; in the instant case, the jury did not find a breach of fiduciary duty based on USAA's failure to pay Powers' claim, but upon its failure to comply with the reasonable requests of its insured.

The jury was instructed on this issue as follows:

> The duty owed by an insurance company to an insured is *fiduciary in nature*. . . . A fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another. This special relationship exists in part because, as insurers are well aware, consumers contract for insurance to gain protection, peace of mind and security against calamity.

(Emphasis added). It is clear that the jury was properly instructed that an insurer's duty to its policyholder is, as USAA concedes, "akin" to a fiduciary relationship.

Notwithstanding the language of this instruction, USAA argues that to affirm the jury's verdict, we would have to recognize a "new tort" which requires the insurer to place the insured's interests above its own. We cannot agree. Nevada has long recognized the special relationship between the insurer and its insured. Ainsworth v. Combined Ins. Co., 104 Nev. 587, 592, 763 P.2d 673, 676 (1988) (hereinafter *"Ainsworth I"*). In the

instant case the jury was not asked to find that USAA breached a duty to place Powers' interests over its own; rather, the jury was instructed to consider whether USAA's refusal to comply with its insured's requests for information relevant to his own claim constituted a breach of "the trust and confidence" an insured is entitled to place in his insurer.

In denying USAA's motion for judgment notwithstanding the verdict or a new trial, the district court cited Tynes v. Bankers Life Co., 730 P.2d 1115, 1124-26 (Mont. 1986). The Montana court reviewed other states' decisions regarding the nature of the fiduciary relationship between insurer and insured, and held that a special relationship between insurer and insured can be described as "fiduciary in nature," although it is not identical to the fiduciary duty relationship of a trust. The court explained that this type of duty is basically a statement of the kind of good faith duty owed by an insurer to a first-party insured. Misconduct, such as misrepresenting or concealing facts to gain an advantage over the insured, is a breach of this kind of fiduciary responsibility. *Tynes,* 730 P.2d at 1126; *see also* Rawlings v. Apodaca, 726 P.2d 565, 571 (Ariz. 1986) (holding that although an insurer is not a fiduciary in the strict sense of the word, "it has some duties of a fiduciary nature" and these duties include an obligation to disclose relevant facts discovered during the investigation of a policyholder's claim); Indus. Indem. of the N.W. v. Kallevig, 792 P.2d 520, 526 (Wash. 1990) (holding that the insurer's duty to act in good faith is a fiduciary duty which is "fairly broad and may be breached by conduct short of intentional bad faith or fraud").

We conclude that the jury's verdict was supported by substantial evidence that USAA concealed facts to gain an advantage over Powers, and that this misconduct constituted a breach of the fiduciary nature of its relationship with Powers. The jury could have reasonably concluded that USAA's failure to comply with Powers' request for photographs, to be present at the raising of his boat, and to have an outside party investigate the boat was not in keeping with a relationship of trust and confidence—fiduciary in nature—with its insured. Such a conclusion supports the jury's finding of bad faith, of which the breach of fiduciary duty is a component.

We are not adopting a new cause of action based on an insurance company's failure to put its insured's interests above its own; we are merely recognizing that breach of the fiduciary nature of the insurer-insured relationship is part of the duty of

good faith and fair dealing.[4] Therefore, we need not address USAA's contention that punitive damages were unfairly assessed on this verdict. Additionally, USAA argues that the jury's verdict does not explain whether it found USAA liable for breaching the covenant of good faith and fair dealing or breaching a fiduciary duty. USAA contends that when there are two actions and no way to determine whether the jury found on one or the other, an error in either action requires a new trial. Lightenburger v. Gordon, 81 Nev. 553, 407 P.2d 728 (1965). However, the verdict indicates that the jury found USAA liable for *both* a breach of the covenant of good faith and fair dealing and a breach of its fiduciary relationship, granting compensatory and punitive damages awards to Powers for both. In this case we view the jury's finding of a breach of fiduciary duty as buttressing the finding of bad faith.

Both parties stipulated to the form of the verdict, and USAA did not request that the court ask the jury to explain its punitive damage amount. The time to raise inconsistencies or irregularities in the form of a verdict is at trial. Eberhard Mfg. Co. v. Baldwin, 97 Nev. 271, 628 P.2d 681 (1981); *see also* Brascia v. Johnson, 105 Nev. 592, 596 n.2, 781 P.2d 765, 768 n.2 (1989) (holding that a party must challenge inconsistencies in a verdict before the jury is discharged, and failure to object while the jury is available to clarify its verdict constitutes waiver).

We conclude that the language in the verdict clearly states the jury's finding and that USAA waived its right to question the form of the verdict by failing to object at trial.

*There was substantial evidence that USAA acted in bad faith by denying Powers' claim*

A judgment will not be overturned if the jury's verdict that an insurer acted in bad faith is supported by substantial evidence. United Fire Insurance Co. v. McClelland, 105 Nev. 504, 780 P.2d 193 (1989). In reviewing this evidence, this court must presume that the jury believed evidence favorable to that prevailing party and drew inferences in that party's favor. *Id.; see Ainsworth I,* 104 Nev. at 590, 763 P.2d at 675. To establish a prima facie case of bad-faith refusal to pay an insurance claim,

---

[4]However, to the extent that the giving of the instruction defining the fiduciary relationship between Powers and USAA constituted error, we adopt the concurrence's view that it was harmless.

the plaintiff must establish that the insurer had no reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage.[5] Falline v. GNLV Corp., 107 Nev. 1004, 823 P.2d 283 (1991).

We conclude that there was abundant evidence upon which the jury could have found that USAA knew or recklessly disregarded the fact that there was no reasonable basis for denying Powers' claim. Experts in investigations management testified that USAA's investigation was improper, incomplete, poorly done, in violation of USAA's own procedures, and rendered the opinion that USAA's conduct amounted to bad faith. Presuming that the jury believed evidence favorable to Powers, it was justified in concluding that USAA began its investigation by submitting the claim directly to its fraud unit, failing to review the evidence objectively. There was substantial evidence that had USAA undertaken an objective investigation, USAA would have discovered evidence to show that the claim should have been paid.

Among other things, McNeely admitted that there were erroneous conclusions in his closing report (e.g., that the disconnected toilet and raw water intake hoses caused the boat to sink); however, USAA made no effort to correct these known errors, even though this report was relied upon by federal authorities in pursuing criminal charges against Powers. Additionally, there was evidence that the gate valve, which had been kept in USAA's custody, had been tampered with so as to further discredit Powers. Furthermore, the jury could have believed that the videotape contained numerous fabrications and was designed to provide USAA with a reason to deny Powers' claim when no such reason actually existed. We conclude that the jury's verdict that USAA is liable to Powers for bad faith is supported by substantial evidence and is not clearly erroneous.

Based upon our review of the record and the parties' arguments on appeal, we conclude that there was substantial evidence to support the jury's award of special and compensatory damages based upon USAA's breach of the insurance contract, bad faith refusal to pay Powers' claim, and breach of a fiduciary relationship. Furthermore, we will not disturb an award of punitive damages unless the trial record lacks substantial evidence to support it. First Interstate Bank v. Jafbros Auto Body, 106 Nev. 54, 56, 787 P.2d 765, 767 (1990).

---

[5]We reject USAA's contention that its actions were reasonable as a matter of law.

We conclude that the evidence the jury could have believed supported a finding that USAA had been guilty of oppression, fraud or malice, express or implied. *See* NRS 42.005. There are numerous facts in the record, taken individually and cumulatively, which support such a determination. The evidence showed that USAA made numerous critical omissions in its investigative process; these omissions support a finding of oppression. A jury could also properly conclude USAA undertook an intentional course of conduct designed to ensure the denial of Powers' claim and that such conduct constituted fraud and malice.

Perhaps the most egregious example of oppression, fraud and/or malice is contained in the USAA videotape of the newly raised Mikimbi. There was ample evidence upon which the jury could have concluded that USAA "enhanced" the actual contents of the Mikimbi in an effort to create support for its decision to deny Powers' claim and to justify the forwarding of his claim to the ICPI and, ultimately, the U.S. Attorney's Office. In this case, we conclude that punitive damages were indeed warranted.

*The imposition of post-judgment interest on punitive damages is proper*

NRS 17.130 outlines computation of a judgment and imposition of any interest thereon.[6] The statute provides for interest to accrue on a judgment as of the date the complaint was served, although interest on certain parts of a judgment, such as damages not incurred until after the complaint was served, accrues as of the date those damages were actually sustained, *see, e.g.,* Gibellini v. Klindt, 110 Nev. 1201, 1209, 885 P.2d 540, 545 (1994) (holding pre-judgment interest accrues on costs from time incurred after complaint served); LTR Stage Lines v. Gray Line Tours, 106 Nev. 283, 289, 792 P.2d 386, 389 (1990) (holding pre-judgment interest accrues on damages from time actually incurred after complaint served).

Powers argues that the plain language of the statute does not

---

[6]The relevant portion of NRS 17.130 states:

1. In all judgments . . . rendered by any court of justice, for any debt, damages or costs . . . the amount must be computed, as near as may be, in dollars and cents . . . .
2. When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied, except for any amount representing future damages, which draws interest only from the time of the entry of the judgment until satisfied . . . .

preclude post-judgment interest on punitive damages; rather, it provides for interest on a "judgment." In the present case, the jury award included compensatory *and* punitive damages, cumulatively comprising the judgment in the case. Powers argues that every aspect of a judgment entered by the court should be treated the same, and that interest should accrue on punitive damages as of the date the judgment is awarded.

We have held that pre-judgment interest does not accrue on punitive damages because a plaintiff is never entitled to punitive damages as a matter of right. Ramada Inns v. Sharp, 101 Nev. 824, 711 P.2d 1 (1985). We later expanded this rule to apply to post-judgment interest on punitive damages. Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003 (1989), *cert. denied,* 493 U.S. 958 (1989) (hereinafter *"Ainsworth II"*). Powers asks this court to revisit the issue and consider the policies in favor of imposing post-judgment interest on punitive damages awards.

The purpose of post-judgment interest is to compensate the plaintiff for loss of the use of the money awarded in the judgment " 'without regard to the elements of which that judgment is composed.' " Air Separation v. Lloyd's of London, 45 F.3d 288, 290 (9th Cir. 1995) (quoting Perkins v. Standard Oil Co., 487 F.2d 672, 675 (9th Cir. 1973)). In *Air Separation,* the Ninth Circuit also noted that failing to award post-judgment interest creates an incentive for the defendant to exploit the time value of money by frivolously appealing or otherwise delaying timely payment. *Id.* "Moreover, awarding post-judgment interest on exemplary damages is consistent with the purpose of post-judgment interest—compensation to a successful plaintiff for the intervening time between entitlement to and actual payment of an award of damages." Brown v. Petrolite Corp., 965 F.2d 38, 51 (5th Cir. 1992).

In response to USAA's contention that allowing interest to accrue on punitive damages would deter meritorious appeals, we note that the courts require defendants who appeal from a judgment for compensatory damages to pay interest, and that imposition is not considered to deter meritorious appeals. Moreover, a defendant whose conduct was egregious enough to warrant the imposition of punitive damages should not be given preferential treatment and be allowed to make money during the appellate process on what has been ordered to be paid to the plaintiff.

Based upon our review of the policies mentioned above, we believe that *Ainsworth II* should be modified to the extent that it denies successful litigants post-judgment interest on punitive damages. Accordingly, we conclude that Powers' punitive dam-

age award should have accrued post-judgment interest as of the date the judgment was entered.

## CONCLUSION

We conclude that materiality of misrepresentation is a question of fact. We further conclude that there was substantial evidence upon which the jury could have concluded that Powers' misrepresentation was not material.

We further conclude that, in limited circumstances, an insurer may be held liable for breaching its fiduciary responsibility to a first-party insured. The jury's finding that USAA breached its relationship in this case was supported by substantial evidence. Further, the verdict properly identified the jury's findings and award of damages.

Additionally, we conclude that the jury's verdict regarding USAA's bad faith was supported by substantial evidence and was not clearly erroneous. Finally, we conclude that Powers is entitled to post-judgment interest on his punitive damages award as of the date the district court entered the judgment.

Therefore, we reverse that portion of the district court's judgment that awards punitive damages without post-judgment interest and remand to the district court to award punitive damages with post-judgment interest. We affirm the judgment in all other respects.

SHEARING and YOUNG, JJ., concur.

MAUPIN, J., concurring:

The opinions of ROSE, J., and SPRINGER, C. J., argue with equal elegance and persuasive force the points made by both sides of this controversy at trial. I write separately because I would prefer to review, not re-try, this matter.

USAA correctly argues that, in light of its exoneration on the causes of action alleging malicious prosecution, intentional infliction of emotional distress, and violation of the Unfair Claims Practices Act, any material representation in the claims process by Mr. Powers to USAA would void any recovery in this matter.[1]

---

[1]Although the malicious prosecution claim (based on the federal prosecution of Mr. Powers for fraud), and the unfair settlement practices and intentional infliction claims were based on several alleged acts that, if proved, were also evidence of bad faith, a successful outcome in favor of USAA on those claims does not compel the conclusion that the verdicts were inconsistent. The jury could have concluded that Mr. Powers failed to prove elements of those claims that were not essential to the claim of bad faith. It is also possible, if not probable, that the jury concluded Mr. Powers had "overpleaded" his case and, thus, the claims upon which USAA was exonerated were simply duplicative of the bad faith claim.

However, in the context of this case, I cannot conclude that the materiality of the misrepresentation was proved as a matter of law.

Ordinarily, a claimant who lies to an insurer has precious little right to complain when his or her claim is denied. Certainly, Mr. Powers' admission through counsel that he initially lied about the sinking of his boat, the Mikimbi, would immunize USAA from bad faith or "fiduciary" liability for a preliminary refusal to pay this claim, and for its undertaking of a comprehensive investigation thereafter.[2] It was the nature of the investigation and the failure to pay after the investigation was complete that provided legitimate "fodder" for Mr. Powers' claims of bad faith and breach of contract.

As my colleagues suggest, the larger body of evidence submitted for consideration by the jury was vigorously disputed. Quite uniquely, the trial court was confronted with evidence of Mr. Powers' attempts to mislead the carrier during the initial stages of the claim, evidence of a shoddy and unprofessional investigation by USAA, an ill-advised referral for prosecution by federal authorities, conflicting evidence regarding how the Mikimbi sank, and allegations that agents of USAA had planted evidence to bolster its claim that Mr. Powers was guilty of sabotage. Thus, the many excellent arguments that did exist for and against the imposition of liability were severely undermined by the "extra-curricular" activities of both parties. Although USAA may have reasonably entertained suspicions and developed competent circumstantial evidence implicating Mr. Powers in the loss of the Mikimbi, the questions of whether Mr. Powers sunk the boat[3] and whether the evidence developed by USAA to that effect justified denial of the claim with or without "proper cause" were, in my opinion, for the jury.[4]

Because there is no doctrine in Nevada of "comparative" bad faith between an insured and an insurer, and because this case was replete with competent evidence, albeit disputed, of misconduct by both sides, I conclude that the trial court properly submitted the issue of the materiality of Mr. Powers' misrepre-

---

[2]Thus, in my view, the fact that the cost of the investigation, including raising the Mikimbi from the ocean floor, far exceeded the value of the claim is irrelevant to the resolution of this matter.

[3]If the jury believed that Mr. Powers did not sink the boat, an issue central to this case, the misrepresentation would have been immaterial as a matter of law. In this connection, I would note that literally every issue in this appeal, save the post-judgment interest dispute, would have been rendered moot if the jury had been asked to resolve via special interrogatory whether Mr. Powers was the culprit in the sinking of the Mikimbi.

[4]Instruction No. 8, conditioned recovery on Mr. Powers' claim for bad faith on a finding that the claim was denied "without proper cause."

sentations to the jury. It was the finding against USAA on this issue that provided the predicate for the breach of contract and bad faith awards.

As to the verdict regarding breach of fiduciary duty, counsel for Mr. Powers contended at oral argument that Mr. Powers sought to establish a claim for a limited fiduciary obligation. The jury was instructed on this issue as follows:

> Plaintiff seeks damages for a breach of a fiduciary relationship between plaintiff and defendant. The duty owed by an insurance company to an insured is fiduciary in nature. In order to recover plaintiff must establish by a preponderance of the evidence that a fiduciary relationship existed between plaintiff and defendant and that defendant breached a duty to disclose known facts to plaintiff.
>
> A fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another.
>
> This special relationship exists in part because, as insurers are well aware, consumers contract for insurance to gain protection, peace of mind and security against calamity.[5]

By use of the term "fiduciary in nature," the instruction seems internally inconsistent. First, this language implies a general, not a limited, fiduciary relationship.[6] Second, an obligation to disclose known information is not, in and of itself, fiduciary. Third, Mr. Powers' attorneys conceded at oral argument that a relationship which is fiduciary "in nature" in this context only means that the insurer must "deal fairly" with its insured. This, of course, does not distinguish this alleged special relationship from any other ordinary contractual relationship. Further, as argued by USAA, first-party claims do not, of necessity, implicate a fiduciary relationship as in the case of third-party claims. This is

---

[5]Mr. Powers pled a general claim for breach of a fiduciary duty. The claim was, based on the language of the jury instruction on this issue, limited somewhat by the trial court. Although the instruction limited the liability theory to evidence that USAA withheld known facts, counsel represented at oral argument that the "limited" fiduciary relationship was argued at trial in terms of failures by USAA to tell Mr. Powers the truth, failures to "seal" the Mikimbi for an independent investigation, and failures to produce certain photographs. Even though these arguments went well beyond the scope of the instruction, I conclude that they were simply part and parcel of the claim for bad faith.

[6]Mr. Powers' counsel concedes that a general claim under this theory was unnecessary and also conceded that first-party claims do not implicate a general fiduciary relationship. Given the fact that the fiduciary duty instruction added virtually nothing to the claim for bad faith, it appears that Mr. Powers' counsel would have been wise to abandon this theory altogether.

because, to a degree, the relationship between the insurer and the insured in first-party claims may, in fact, become adversarial. *See* Beck v. Farmers Ins. Exch., 701 P. 2d 795, 800 (Utah 1985).[7]

Here, however, the definition of a "fiduciary" relationship in the jury instruction is so innocuous as to add little or nothing to the elements of Mr. Powers' bad faith claim. The instruction is devoid of the standard language defining this tort; i.e., that " 'one party gain[ed] the confidence of the other and purport[ed] to act or advise with the other's interests in mind . . . .' " Perry v. Jordan, 111 Nev. 943, 947, 900 P.2d 335, 338 (1995) (quoting Kudokas v. Balkus, 103 Cal. Rptr. 318, 321 (Ct. App. 1972)), or that USAA was in a " 'superior position to exert unique influence of the dependent party. . . .' " Hoopes v. Hammargren, 102 Nev. 425, 431, 725 P.2d 238, 242 (1986) (quoting Barbara A. v. John G., 193 Cal. Rptr. 422, 432 (Ct. App. 1983)). Thus, because the definition of a fiduciary relationship added nothing to the duties attendant to the covenant of good faith and fair dealing, implied in every contract, providing this instruction to the jury was harmless error.

I would note that the nature of this case represents an anomaly in this area of jurisprudence. Thus, it is only of marginal precedential value. The bench and bar should be most careful in the future about drawing any sweeping conclusions from it.[8]

SPRINGER, C. J., dissenting:

I dissent because I believe the majority has misapprehended the facts of this case, has ignored several errors committed by the trial court and has distorted our jurisprudence relating to the adjustment of property insurance claims.

I begin by noting my disagreement with the majority's perception of the critical, false statements which Mr. Powers made to his insurance company. Mr. Powers represented to the company, under oath, that the cause of his boat's sinking was that the boat's exhaust hose had "deteriorated" and "broke loose" near the

---

[7]Fiduciary obligations are a signal feature of third-party claims covered by liability insurance. These obligations arise largely from the insurer's right and duty to provide legal representation to the insured, and the right to control the conduct of the defense of suits against the insured. *See Beck,* 701 P.2d at 799. Such obligations also stem from the duty of the insurer to protect the insured's personal estate from extra-contractual liability. The duty of the carrier to exercise good faith in the processing of first-party claims is not fiduciary per se, but is only "akin" to such an obligation. Therefore, a separate instruction on fiduciary obligations should not be given in this context.

[8]I agree with ROSE, J., that an award of punitive damages should be subject to post-judgment interest.

point where it exited the hull. The broken hose, according to Mr. Powers' version of the sinking, caused sea water to enter the hull of the boat, causing it to sink. With no disrespect intended, the sworn proof-of-loss statements which Mr. Powers gave to his insurance company were, plainly and simply, lies.[1] The truth is that the external exhaust hose did not "break loose" because of natural deterioration. Mr. Powers, according to his own later statement, "cut it with a knife."

The record makes it plain to me that Mr. Powers did not admit that he had cut the hose until he realized that the company was going to raise the sunken boat and would discover that the hose had been cut. Mr. Powers explains his false statements by saying that the false reports were made because he feared that "USAA would automatically deny his claim" if he told the truth.

Naturally, the USAA did not consider these lies to be "immaterial" and asked for a federal investigation into marine insurance fraud. The FBI did not think the misrepresentations were immaterial, and the federal prosecutors did not think that they were immaterial; a federal grand jury indicted Mr. Powers based upon the FBI's investigation.

Mr. Powers' lies would be immaterial only if they were not "reasonably relevant to the insurance company's investigation." When a claimant tells an insurer that his loss was caused in a certain way, and it is later conclusively established that the insured gave a false account of the incident, there is no way that such statements can be immaterial and not related to the "company's investigation." Of course, an insured's description of the loss is related to the investigation; it is the heart of the investigation.

I part company with the majority in two vital respects. The first is the majority's saying that Mr. Powers' original false report (that the hose "deteriorated" and "broke loose") was made not to deceive the insurance carrier, but rather, "to simplify his explanation." To me, there is sufficient difference between cutting a hose and having it deteriorate and break loose on its own to

---

[1]Mr. Powers actually gave at least three different versions of the events leading up to the sinking: (1) that an exhaust hose deteriorated at the thru-hull causing water to leak in through the ruptured hose; (2) story number 1, plus water being pumped by the engine into the hold through the ruptured exhaust hose (sworn proof of loss) and (3) the hose had "detached" at one end (having "slipped off" the engine manifold) and was cut at the other, thru-hold end, thereby causing some kind of "siphon" which caused the hold to fill with water to sink the boat. I recount these "versions" merely to support my saying that USAA certainly had reasonable grounds for investigating the claim, rather than paying it, and for referring the matter to federal authorities.

conclude that Mr. Powers was lying and not simplifying. My second disagreement with the majority is with its focus on what caused the boat to sink. No one knows what caused the boat to sink except Mr. Powers. The majority and concurring opinions seem to assume that Mr. Powers can recover millions of dollars against his insurance company if he proved to the jury that he did not deliberately sink his boat. Mr. Powers was in deep financial and domestic trouble, and insurance investigators had many sound reasons to believe he sank his boat; but, for the purposes of this lawsuit, this does not matter. What does matter is that he made false, sworn statements and misled his insurance carrier in its investigation, causing it to spend hundreds of thousands of dollars to try to get to the truth of the matter.

Mr. Powers sued his marine insurance carriers in contract and tort based on the insurance companies' claimed "refusal without proper cause"[2] to pay Mr. Powers' claim for loss of his sail boat. A jury awarded Mr. Powers judgment and damages on his contract claim and on two tort claims, one for the tort of breach of the implied covenant of good faith and fair dealing, the other for USAA's commission of a tort previously unrecognized in Nevada, namely, a property insurance company's supposed breach of a fiduciary duty to "disclose known facts."

Under the terms of Mr. Powers' insurance policy, "[f]alse swearing, concealment or misrepresentation of any material fact by any covered person" violates the insurance contract and "voids" the policy. Although Mr. Powers admits that he was guilty of false swearing, concealment and misrepresentation of fact, he claims that these were not "material" and that, therefore, the insurance contract should not be voided. The facts relating to Mr. Powers' false swearing, concealment and misrepresentation of material facts are as follows.

Mr. Powers' boat sank on April 28, 1987. The boat was insured by USAA. Approximately two weeks after the sinking, on May 11, 1987, Mr. Powers told Wayne McNeely, a claims investigator for USAA, that the reason his boat sank was that an exhaust hose had "deteriorated" and ruptured near the place where the hose passed through the hull to the outside of the boat (a place called the "thru-hull"). Mr. Powers told Mr. McNeely that, when he discovered the ruptured hose, he "grabbed the hose and could feel the water coming from the outside." According to Mr. Powers' then-version of the facts, he realized immediately that taking the sail down would "help the boat straighten out and maybe the thru-hull wouldn't be so deep in the water." Mr.

---

[2]Instruction No. 8.

Powers told Mr. McNeely that after he took down the sail, the thru-hull was still "about half way in the water" and, thus, "water was still coming in the boat." Mr. Powers tried to stuff towels into the ruptured hose, but to no avail; and, according to Mr. Powers, the boat continued to take on water until it sank.

On June 14, 1987, about a month after his May 11 report to Mr. McNeely, Mr. Powers filed his official, sworn "proof of loss" with USAA. In this sworn statement Mr. Powers claimed that his loss was due to the "failure of the main engine exhaust hose at the exit thru hull . . . causing sea water to be pumped into boat . . . through [the] exposed thru hull fitting." In his sworn proof of loss statement, Mr. Powers did not tell the truth, did not admit that he had *cut* the hose. He used the word *failure* of the exhaust hose rather than a *deterioration,* as he had first reported. In his formal, sworn proof of loss statement, Mr. Powers added another complication to the sinking; he stated that sea water was being "pumped into [the] boat by [the] main engine." Later, he claimed that the water was propelled by a siphoning effect, rather than by the force of the engine.

None of Mr. Powers' varying stories made much sense to USAA's claims operatives; so USAA decided to contract for the investigative services of Bachrach & Wood Associates to make an independent investigation and evaluation of the sinking. Bachrach quite understandably concluded that Mr. Powers had made "numerous contradictions" in his previous statements and found Mr. Powers' versions of the incident to be inconsistent with Bachrach's independent investigation of the facts. (For example, Bachrach noted that Mr. Powers claimed that his boat was operating on auto pilot prior to discovering that something was "amiss"; however, Bachrach reported that upon "inspection there was no auto pilot aboard the vessel, nor any adapters or apparatus providing evidence that there ever was an auto pilot aboard.") Bachrach concluded its report in the following manner:

SYNOPSIS OF OBSERVATIONS:
The undersigned, using the sworn statement under oath by Mr. William R. Powers as the basic data, and other statements and miscellaneous items, as well as sighting the vessel as auxiliary data, construed the aforementioned observations and other points of interest, and offers herewith the following synopsis:

The insured in initiating his claim for the sinking of his 42 West Sail sailboat, the "MIKIMBI", made various statements which contained numerous contradictions. It is the opinion of the undersigned that the ultimate reported cause of subject vessel sinking, under the conditions that reportedly existed at the time of the reported sinking, would have been nearly an impossible feat.

After receiving the Bachrach report, USAA officials decided to raise the boat from the bottom of the gulf and take a look for themselves. Mr. Powers was, of course, the only witness to what had been going on inside the boat at the time of the sinking; and, so long as the boat was on the bottom of the sea, Mr. Powers could tell about any story he chose to tell. When Mr. Powers learned of USAA's plan to inspect the boat, he realized that he had a problem. Mr. Powers knew that the hose had not "deteriorated" at the thru-hull. It had not "failed"; rather, Mr. Powers had *cut* the hose, and insurance investigators would have been justified in suspecting that it was Mr. Powers' intentional cutting of the hose that caused the water to enter the boat. As Mr. Powers himself admitted, he feared that his lies would be discovered. By his own account, Mr. Powers was forced to "explain this because somebody is going to look down there and see . . . that cut hose." Mr. Powers admitted at trial that, at the time he told USAA that the hose had deteriorated or "failed," he was "playing with the truth a little bit" (sometimes called "simplifying"). Eventually, the time came when Mr. Powers had to admit that he had cut the hose himself.

USAA had the benefit of Bachrach's opinion that Mr. Powers' first accounts of the sinking were "nearly impossible"; still, USAA decided to employ another, independent investigator, an admiralty law firm, to provide a "second opinion" in order to have additional advice as to whether USAA should pay this claim. Admiralty lawyer Allen von Spiegelfeld of the retained admiralty firm took Mr. Powers' sworn deposition and gave Mr. Powers another opportunity to give his version of the sinking. Mr. von Spiegelfeld reported the results of the deposition and his appraisal of the same in a letter to USAA dated October 26, 1987.

In the October 26 letter, Mr. von Spiegelfeld reported Mr. Powers' latest version of the sinking. Mr. Powers told Mr. von Spiegelfeld that he had awakened from a nap to see smoke coming from the engine room. Upon inspection, Mr. Powers noticed that the exhaust hose had detached itself from the engine manifold[3] and that the engine was emitting exhaust and water into the engine room. Mr. Powers related that he tried to reattach the hose to the engine but that he could not do so because of the heat. He stated that he then turned off the engine, thus stopping the water and exhaust from being pumped into the room. According to Mr. von Spiegelfeld, Mr. Powers explained:

---

[3]Testimony at trial indicated that the heat of the manifold has a tendency to fuse exhaust hoses to the manifold and that the hose is "very, very difficult to get off" of the engine. Mr. Powers' own expert, William Crealock, admitted that it is uncommon for a hose to come off at the exhaust manifold. USAA investigators thought that Mr. Powers was aware of this fact and that this was why he first made up the story that the exhaust hose "failure" was at the other end of the hose, at the thru-hull entry into the boat.

Upon returning to the engine room, he found that water was coming in through the exhaust hose from the through hull fitting. It was his version that suction had somehow been created, which was causing the water to pump into the vessel via the through hull fitting. Mr. Powers stated that in order to stop the suction effect he went over to a panel to the through hull fitting for the exhaust hose and with a screw driver took the panel off. . . . Mr. Powers then state[d] that he cut the 4-inch hose with a knife and also used a pair of pliers to cut the wire. According to his deposition he tried to stuff the hole with rags, however, everytime the boat would wallow to port the rags would fall out and the water would gush in.

At a certain point after the boat had taken on water, Mr. Powers decided to abandon his boat, and he was rescued by a fishing vessel. He told Mr. von Spiegelfeld that, later, "since his boat was not sinking, he asked that he be pushed back to it." Mr. Powers, then, after being "rescued," returned to his boat. Mr. von Spiegelfeld goes on to report:

Upon getting back on board his boat the water was higher, however, he attempted to plug the hole to the through hull fitting again. For reasons he could not explain, Mr. Powers claims that he reattached the hose to the exhaust manifold at this time. *This makes absolutely no sense since no water was coming in through the boat hose.*

(Emphasis added.)

The admiralty attorney's investigation prompted him to report to the company:

Mr. Powers' statements are very inconsistent and make little sense.[4] He acknowledged several false statements made

---

[4]The company was, understandably, very much concerned about the inconsistencies and implausibility of Mr. Powers' various versions of the sinking. For example, in his May 11, 1987, version, Mr. Powers said that he "shut the engine off immediately and went below." In his October 1987 statement he said that he did not turn off the engine prior to going into the engine room. This becomes important because of Mr. Powers' claim that he suffered from carbon monoxide poisoning in the engine room, which, according to his and other testimony, had all portholes open. "[T]he engine room was just full of smoke, and it was dark back there. I couldn't hardly see, and water was almost up to my knees." In his October 6 statement Mr. Powers testified that the water was "about 8 inches" deep. It was "about mid-calf or over my ankles." USAA investigators were concerned about this discrepancy because if the water had been over eight inches in depth, the air intake for the engine would be under water and the engine would probably not have been running under these circumstances. Mr. von Spiegelfeld, the admiralty lawyer, reported to USAA his opinion that Mr. Powers' change in

early on in the investigation. When asked why he came up with his original story about the rotted hose, he wavered and waffled. Ultimately Mr. Powers stated that he lied because he did not want to confuse the claim. . . . Mr. Powers also did not explain why he reattached the 4-inch hose to the exhaust manifold, or how he did it while the engine was under water.

Mr. von Spiegelfeld concluded his report by saying:

We are of the opinion that Mr. Powers['] claim should be denied and that the basis for denial should be on the basis that the loss was "caused intentionally by or at the direction of a covered person." Furthermore, it should be stated that

story resulted from his "realization that the engine would have [to have] been under water if he were in knee deep water in the galley."

Mr. Powers told two different stories as to when he lowered the sail. In his October statement, Mr. Powers said that he lowered the sail before he cut the hose. (Before the cut, and while Mr. Powers was trying to get to the valve to cut off the outside water inlet, and before he found it necessary to cut the hose, he testified that, "it dawned on me that I was still heeling to port because of my mainsail being up. So I went back up and got the mainsail down.") Later in his statement, Mr. Powers testified that the sail lowering was performed *after* he had cut the hose. ("It [the sail-lowering] was after I cut it, and it dawned on me that I was heeled over to port, and if I got that sail down, it might help a little bit.") USAA considered this inconsistency to be important because once the sail was lowered, the boat would come upright, stop its forward movement and float idly in the water, thereby breaking the siphon which Mr. Powers claimed was causing his boat to fill with sea water through the cut portion of the exhaust hose. If Mr. Powers had, as was once his testimony, taken the sail down before he cut the hose, it would appear that any siphoning would have been stopped and that very little, if any, water could have entered the boat by way of the thru-hull opening. It is hard to claim, under these circumstances, that USAA was not justified in making further inquiries before paying this claim.

Another matter that caused some pause on the part of USAA investigators was the question as to whether Mr. Powers' reinstallation of the end of the exhaust hose that he claimed had become detached from the engine manifold had taken place before or after he had cut the hose at the hull end, at the thru-hull fixture. In his October statement to Mr. von Spiegelfeld, Mr. Powers explained how he "reclamped" the hose to the engine. Mr. Powers was asked if this was "after you cut the hose," and he answered in the affirmative. It is not difficult to understand why USAA would question this answer and to wonder why Mr. Powers would say that he went to the trouble of reclamping the dangling hose to the manifold, unless, as suspected by USAA, Mr. Powers testified in this way to conform his testimony to the condition that the boat was in when it was raised. Mr. Powers could not very well maintain his story that all of his problems were traceable to the hose's detaching from the engine manifold, when the recovered boat showed that the hose was attached to the engine. I recount these additional inconsistencies not to "reargue the facts" of this case, but merely to show that USAA's decision, based upon two independent recommendations, was "reasonable" under the circumstances.

the policy was voided by the "false swearing, concealment or misrepresentation of any material fact by any covered person."

On December 14, 1987, approximately two months after receiving the von Spiegelfeld report, USAA, following attorney von Spiegelfeld's advice, wrote to Mr. Powers, advising him that it was "denying coverage" on the grounds that the loss had been "caused intentionally" and that the policy was "voided" by reason of Mr. Powers' violation of the policy provision relating to "false swearing, concealment or misrepresentation of any material fact by any covered person."

## CONTRACT LIABILITY

In my view, Mr. Powers does not have an enforceable claim in either tort or contract. With respect to Mr. Powers' contract claim, USAA based its denial of his contractual claim on two grounds: first, that the independent investigators believed that Mr. Powers had intentionally sunk his boat and, second, that Mr. Powers was guilty, in connection with USAA's claims investigation, of false swearing, concealment and misrepresentation of material facts. USAA does not now claim the right to prevail in this appeal by reason of Mr. Powers' having intentionally sunk his boat[5]; rather, USAA claims that it is entitled to judgment as a matter of law based on the provision in the policy that reads:

> False swearing, concealment or misrepresentation of any material fact by any covered person voids this policy.

It is uncontested and admitted that Mr. Powers was guilty of "false swearing, concealment [and] misrepresentations" relating to the manner in which this loss was incurred. Mr. Powers admits that he intentionally lied to the company because he feared that if he told the truth, USAA "might deny" his claim. Mr. Powers' strained position at trial and on appeal is that the quoted policy provision does not apply to his claim because his misrepresentations and concealments were not "material" to USAA's investigation of the circumstances relating to the sinking.

USAA argues that the misrepresentations in question were material as a matter of law and that, if they are not material as a matter of law, there was no probative evidence in the record to support a jury finding that the misrepresentations were not material.

The jury was instructed that a lie is "material if it concerns a

---

[5]The issue of whether Powers intentionally sank his own boat to defraud his insurance company has no part to play in either the contract or tort claims in this lawsuit.

subject reasonably relevant to the insurance company's investigation." I do not see how it can possibly be said that Mr. Powers' lies had no relation to this investigation. If it had not been for Mr. Powers' lies and his inconsistent versions of the sinking, the insurance companies would not have had to spend hundreds of thousands of dollars to raise the boat and to intensify the investigation.

I would agree with the majority that, as a general rule, questions of materiality in the context of misrepresentations made in the claims process are questions of fact; however, the facts in this case dictate that the misrepresentations made in this case cannot properly be considered in any way other than as *material* misrepresentations. Mr. Powers' varying and sometimes starkly false versions of the sinking go to the very core of the "insurance companies' investigation" and are eminently relevant to the investigation. The insurance companies had a duty to investigate the false claims. Because it cannot be said under any circumstances that the lies were not *relevant* to the investigation, I would conclude that they are material as a matter of law.

USAA correctly argues in its brief that "questions relating to the insured's involvement with the actual sinking are pertinent [and therefore material] to an issue of coverage, . . . [and that] the insured is obligated to answer truthfully." As I have said, under most circumstances involving misrepresentations by an insured to an insurance company, it is "a question of fact for the jury to decide whether the variance between the representation and the existing facts was material." Gerhauser v. N. B. & M. Ins. Co., 7 Nev. 174, 196 (1871). "The rule is well established that, if the materiality of the representations or statements depends upon inferences to be drawn from facts and circumstances proved, the question of materiality is one for the jury." Smith v. N. A. A. I. Co., 46 Nev. 30, 43, 205 P. 801, 804 (1922). In both *Gerhauser* and *Smith,* the materiality issue arose with respect to false statements made in insurance applications; and it was acknowledged in *Smith,* 46 Nev. at 44, 45, 205 P. at 805, that materiality could be judged as a matter of law in cases in which the parties' contract stipulates that certain facts shall be considered material; but, where "materiality must be shown by matters outside the terms of the contract, it is a question of fact," *id.* at 45, 205 P. at 805. Unlike the situation in *Gerhauser* and *Smith,* the deception here relates to the claims process rather than to the application process, and it is only infrequently in cases of this kind that the materiality issue must be taken from the jury. This is one of those cases.

It is my view that Mr. Powers' lies were material as a matter of law because there is no logical way in which they could be found

not to be material; and there is no sufficient evidence in the record from which a jury could come to a contrary conclusion. I believe this to be the case even if a competent expert witness were to testify to the contrary.

The only evidence from which it could possibly be concluded that Mr. Powers' lies were not material was introduced in the form of opinion evidence by an expert in insurance law, a Mr. Patrick Fitzgibbons.[6] Mr. Fitzgibbons, however, did not testify that Mr. Powers' misrepresentations were not relevant or that they did not affect the insurance company's investigation of this claim; Mr. Fitzgibbons just flatly told the jury that Mr. Powers' misrepresentation was not a "material misrepresentation." Mr. Fitzgibbons' opinion is unsubstantiated by fact or reason and provides no substantial evidence on the issue of materiality. As I have already pointed out, there is no way in which Mr. Powers' misrepresentations can be viewed as being either irrelevant or immaterial to the investigation of this sinking.

Mr. Fitzgibbons presented the jury with his conclusion that Mr. Powers' tale about the deteriorated hose was not a "material misrepresentation." The first unfounded reason that Mr. Fitzgibbons gave to support his opinion that the misrepresentations were not material was that a deteriorated hose was not (at least according to Mr. Fitzgibbons) the real cause of the sinking, or as Mr. Fitzgibbons put it, the misrepresentation was not material because "the exhaust hose deteriorat[ion] was not the cause of the sinking of the vessel." The other justification offered by Mr. Fitzgibbons for his opinion that Mr. Powers' misrepresentations were immaterial was that Mr. Powers' later recanting of his first stories rendered the previous lies immaterial.

With regard to the first reason for his opinion, that the misrepresentation about the deteriorated hose was not material because hose-deterioration was not the real cause of the sinking, it would appear that what Mr. Fitzgibbons was telling the jury was that the false story about the deteriorated hose would not be material unless hose-deterioration was the actual cause of the sinking.

[6]The testimony of Mr. Powers and witnesses called by him might lead to the conclusion that Mr. Powers' cutting of the exhaust hose himself did not cause the boat to sink. The jury might even have believed Mr. Powers' second or third version and believed that the boat sank not because Powers cut the exhaust hose near where it passed through the hull of his boat to the outside sea water but, rather, because the exhaust hose became detached at its juncture to the exhaust manifold. As I have maintained throughout, whether Mr. Powers did or did not deliberately sink his boat by cutting the exhaust hose where it exited the hull is not an issue in this case. The issue is whether his deliberately false representations were "reasonably relevant" to the insurance carriers' investigation of the sinking. I do not see how it can possibly be said that these lies were "immaterial," which is to say that they had no importance or relevance to the investigation.

According to Mr. Fitzgibbons, so long as Mr. Powers did not lie about the *real* cause of the accident, his false statements were necessarily immaterial to USAA's investigation. Such an opinion and such an explanation has no basis in law or logic. In the first place, Mr. Fitzgibbons does not have the slightest idea as to what the *real* cause of the sinking was; he knows no more about what caused the boat to sink than I do and did not *claim* to know. As a consequence, Mr. Fitzgibbons' assumptions as to the real cause of the sinking are completely unwarranted and cannot be accepted as legitimate grounds for his expert opinion.

Secondly, even if Mr. Fitzgibbons were competent to testify as to the true cause of the sinking, whether a deteriorated exhaust hose was or was not the cause of the sinking has nothing to do with the materiality of the misrepresentations. What does have to do with materiality, as discussed throughout this dissent, is whether the misrepresentations "concern[ed] a subject reasonably relevant to the insurance company's investigation" (Instruction No. 14), whether they "affected the attitude and action of the insurer" in its investigation, or whether they were "calculated either to discourage, mislead or deflect the company's investigation in any area that might" have been "a relevant or productive area to investigate." Pacific Indem. Co. v. Golden, 985 F.2d 51, 56 (2d Cir. 1993) (citing Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 184 (2d Cir. 1984), *cert. denied,* 469 U.S. 874 (1984). If Mr. Fitzgibbons had told the jury that Mr. Powers' misrepresentations were not material because they were not relevant to USAA's investigation, or that they would not affect the attitude or actions of USAA in its investigation or that the misrepresentations were not calculated to discourage, mislead or deflect the investigation, *these* reasons might have provided an acceptable basis for the opinion. That the sinking was or was not caused by a deteriorated hose has nothing to do with the *materiality* of the misrepresentations; and Mr. Fitzgibbons' assumption that the sinking was not caused by a deteriorated hose provides no rational support for his opinion that the misrepresentations were not material.

Mr. Powers put the matter correctly in his brief: "Not all misrepresentations provide a ground for denying coverage and voiding an insurance policy. It is only a *material* misrepresentation which has this effect." In support of his position, that *his* misrepresentations were not material, Mr. Powers cites Pacific Indem. Co. v. Golden, 985 F.2d 51 (2d Cir. 1993), a case in which, according to Mr. Powers' brief, the claimant lied about *why* he stored gasoline in his home and "later admitted this was a lie." The claimant untruthfully told the insurance company that he had stored the gasoline for use with his snowmobiles; whereas, in actuality, he had stored the gasoline in order to

poison his neighbor's lawn. He later admitted that he had told the false story because he was embarrassed to tell the real reason for storing the gasoline and because he was afraid that storing gasoline in his home would affect his coverage. The district court entered judgment against the claimant because of the misrepresentations. The Second Circuit Court of Appeals reversed, holding, properly I think, that the claimant's personal reasons for storing gasoline in his home were not material, not relevant to the cause of the fire or to the company's investigation. The *Pacific Indemnity* case is, of course, entirely different from the case at hand.

Mr. Powers offered no evidence to show that his misrepresentations were not relevant to USAA's investigation of the sinking of his boat other than the mentioned conclusory opinion of Mr. Fitzgibbons that the Mr. Powers' misrepresentations were not material. In his brief, however, Mr. Powers makes an argument that leads to the conclusion that the issue of whether the hose deteriorated or was intentionally cut is very much relevant to the insurance company's investigation. Asserts Mr. Powers:

> If a boat sinks because a hose deteriorates and comes off, allowing water to enter the boat, that would be an accidental loss and covered. If an insured intentionally cuts a hose for no apparent reason, and lets water enter his boat, that *would appear to be an effort to sink the boat*.

(Emphasis added.)

Mr. Powers is correct in saying that his cutting of the exhaust hose at the thru-hole "would appear to be an effort to sink the boat." Understandably then, it "appeared" to USAA also that Mr. Powers had engaged in "an effort to sink the boat." Under these circumstances, it is difficult for Mr. Powers to maintain that whether the hose deteriorated or was intentionally cut does not matter and is irrelevant to USAA's investigation of the sinking. Mr. Powers' deterioration-of-the-hose lie "would appear" to be material; and if this is the case, then USAA had every right to consider Mr. Powers'. misrepresentations to be relevant to its investigation. That deterioration of the hose was or was not the actual cause of the sinking has absolutely nothing to do with the question of whether Mr. Powers' misrepresentations were *material*.

Mr. Powers did not or could not bring in evidence that insurance companies do not consider misrepresentation of this kind to be relevant to their investigations; rather, he brought in an expert who simply stated his unsupported conclusion that Mr. Powers' misrepresentations were not material in this case and gave as

reasons for that opinion the two, unacceptable reasons mentioned above: the cause of the sinking was not a deteriorated hose and Mr. Powers recanted his lie.

Having discussed Mr. Fitzgibbons' faulty and unfounded explanation that the deteriorating hose lie was not material because deterioration was not the *cause* of the sinking, I go on to examine the other reason that Mr. Fitzgibbons gave for saying that the misrepresentations were not material, namely, that Mr. Powers' recanting of the lies renders them immaterial. Specifically, Mr. Fitzgibbons told the jury that if Mr. Powers "came back and corrected any misrepresentation . . . that would not be a material misrepresentation." Mr. Fitzgibbons was clearly wrong when he told the jury that when Mr. Powers "corrected" his misrepresentation, this rendered the misrepresentation immaterial to USAA's investigation.

The idea that lies become immaterial once they are recanted has a little more substance to it than the idea that lies to one's insurance company are rendered immaterial if the falsely-stated versions were not the "real" cause of the loss. Mr. Fitzgibbons' reasoning with respect to the recanting of lies is that USAA eventually did learn the "truth" (defined as Mr. Powers' latest version of the sinking) and that, therefore, the company was not materially affected by Mr. Powers' earlier lies. It seems to me that neither the company nor Mr. Fitzgibbons ever learned the "true" cause of the sinking. Only Mr. Powers knows.

The subject of materiality as it relates to later revelations of the "truth" is discussed in Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179 (2d Cir. 1984), *cert. denied,* 469 U.S. 874 (1984). In *Fine,* the issue was whether a false statement would be material only if it related to a matter which ultimately proved to be decisive in the ultimate disposition of the claim, or whether it is sufficient merely that the false statement concerned a subject reasonably relevant to the insurance company's investigation at the time. The court's answer to this question was:

> The law is clear that the materiality of [a] false statement[] during an insurance company investigation is not to be judged by what the facts later turn out to have been.

*Id.* at 183.

According to *Fine,* materiality is "not determined by whether or not the false answers deal with a subject later determined to be unimportant" because the loss was "*caused by factors other than those with which the statements dealt.*" *Id.* at 184 (emphasis added).

> False sworn answers are material if they might have affected the attitude and action of the insurer. They are equally material if they may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, *at that time,* a relevant or productive area to investigate.

*Fine,* 725 F.2d at 184 (emphasis added).

*Fine* disposes of Mr. Fitzgibbons' explanation that recanting of former untruths cures the misrepresentations and makes them immaterial. This being the case, neither Mr. Fitzgibbons' explanation that false statements cannot be material, nor his explanation that recanting a former lie cures the defect and renders the lie immaterial, can support his final, conclusory opinion that Mr. Powers "did not make a material misrepresentation."

Mr. Fitzgibbons' opinions are patently fallacious and unreliable. One who makes a claim of loss to an insurance company cannot be excused for lying just because his false rendition later turns out not to have been the true cause of the loss or because he is later caught in a lie and recants the false statement.

On its face, the manner in which a boat sinks would ordinarily, if not always, be seen as being of paramount importance and materiality to the insurance company that was being asked to pay for the loss; and it would not matter much to an investigating insurance company if the claimant's misrepresentations were, after the fact, recanted or shown not to be causally related to the eventually-discovered cause of the loss. For example, if Mr. Powers had told USAA that his boat had been hit by an air-to-sea missile and then, at a later date (after he suspected that the company was going to raise and inspect the boat), admitted that, actually, he had not been hit by a missile at all but had collided with a reef, then, probably, most would see the air-to-sea missile story as being a *material* misrepresentation on his part. Under such hypothetical circumstances, few would accept Fitzgibbons-like testimony to the effect that the sworn misrepresentation by the insured that his boat had been sunk by a missile was not a *material* misrepresentation either (a) because the missile story was false and a missile was not the "real" *cause* of the boat's sinking or (b) because the insured's first, false statement was later recanted and replaced by a new, "true" story.

It is hard to understand the jury's conclusion that Mr. Powers' false statements were not "material" other than by assuming that the jury must have accepted Mr. Fitzgibbons' "expert" but baseless conclusion that Mr. Powers' telling USAA false stories about how the boat sank were not material to the insurance companies' claims investigation. It would also appear that the

jury must have accepted the reasons given by Mr. Fitzgibbons for his opinion, namely, that a lie to one's insurance company about how the loss occurred is not "material" if the false facts are not the "real" cause of the loss or if the insured recants a previous lie. This being the case, the jury had no substantial or reliable evidence before it upon which to base a conclusion that Mr. Powers' false swearing, concealments and misrepresentations were not "material."

There is another, second reason why the jury verdict on contract liability must be set aside. The reason is that, even if it were to be conceded that the lies in question were not material as a matter of law, it was error for the trial court to permit the jury to receive an opinion going to the matters which should be decided properly by the jury itself and not by an expert witness.

USAA cites in support of this position the advisory notes to Federal Rule of Evidence 704 (the model, claims USAA, for Nevada's enactment of NRS 50.295). The cited notes caution against "the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." The *sole* issue in Mr. Powers' contract claim was whether the admitted misrepresentations were material. If the misrepresentations were material, the policy is voided, and USAA prevails. If the misrepresentations were immaterial, the misrepresentations do not matter, and Mr. Powers can recover on his insurance claim. When Mr. Fitzgibbons was allowed to tell the jury that Mr. Powers' misrepresentations were not material and, in effect, that they were not relevant to the insurance company's investigation, he was telling the jury what result to reach, namely, to decide in favor of the claimant rather than the insurance company.

The referred-to advisory notes condemn the use of such questions as, "Did T have capacity to make a will?" Testamentary "capacity" is a matter to be decided by the judicial forum and not by the opinion of a legal "expert." A proper question, then, would be: "Did T have sufficient mental capacity to know the nature and extent of his property and the natural object of his bounty to formulate a rational scheme of distribution?" The difference between the two kinds of questions is, obviously, that one calls for a legal conclusion that is determinative of the controversy, the other is evidential and does not.

Mr. Fitzgibbons could have been asked questions about whether Mr. Powers' telling the story of the deteriorated exhaust hose was "relevant to the insurance company's investigation," or whether a "reasonable person would attach importance" to these lies, or whether the misrepresentations "might affect the attitude

and action of the insurer in its investigation." Mr. Fitzgibbons did not testify in this manner; rather, he bluntly told the jury: "My opinion is that Colonel Powers did not make a material misrepresentation." This legal conclusion was an opinion that "told the jury what result to reach." Mr. Fitzgibbons' answer was dispositive of USAA's defense to contract liability in this case.

The jury was correctly instructed on the issue of materiality and instructed that a fact is *material* if "a reasonable person would attach importance to that fact" and if the fact "concerns a subject reasonably relevant to the insurance company's investigation." The only evidence that Mr. Powers' several inconsistent and incompatible stories[7] were not important or relevant to the investigation was Mr. Fitzgibbons' saying so. Mr. Powers himself does not explain how such stories could be irrelevant or unimportant to an insurance investigation. In his brief, Mr. Powers cites to Pacific Indem. Co. v. Golden, 985 F.2d 51 (2nd Cir. 1993), in support of his argument on the materiality issue. Citing this case, Mr. Powers tells this court that a

> misrepresentation is not material unless it might affect the attitude and action of the insurer in its investigation, or was calculated to discourage, mislead or deflect the company's investigation in an area that might have been relevant or productive to investigate.

*Id.* at 56.

What Mr. Powers fails to tell us, however, is that this case does not support his position. He does not tell us how his misrepresentations and concealments would *not* affect the attitude and action of the insurer, or how his misrepresentations and concealments could be said *not* to be calculated to discourage, mislead or deflect the company's investigation. It is certainly clear to me that Mr. Powers' conflicting stories did affect the action of the company (for example, the company's action in spending some $300,000.00 to recover the boat); and it is also apparent, from his own admissions, that his false stories were "calculated" to deflect the company's investigation.

The only explanation for the jury's apparent conclusion that the misrepresentations and concealments were not material is that

---

[7] It cannot be said exactly what prompted Mr. Powers to tell these varying stories other than that he was trying to influence the manner in which his claim was being handled by USAA. Mr. Powers himself apparently believed in his own mind that his statements were of sufficient relevance and importance to the company that he was willing to risk telling lies about what truly happened.

the jury misunderstood Mr. Fitzgibbons' unfounded conclusions and that these conclusions became dispositive of Mr. Powers' contract claim. Because of the inherent unreliability and conclusory nature of the Mr. Fitzgibbons' opinion and because it was prejudicial error for the trial court to have permitted this opinion evidence to be received by the jury, I would reverse the judgment of the trial court and remand for retrial Mr. Powers' contract action for recovery of the value of his boat.

## TORT CLAIMS

As summarized in Mr. Powers' brief, "[t]he jury found that USAA had breached the covenant of good faith and fair dealing and breached a fiduciary duty to disclose information to Col. Powers. For this, the jury awarded compensatory damages of $350,000.00." The antecedent of the pronoun "this" is USAA's commission of two torts, namely, that USAA "had breached the covenant of good faith and fair dealing *and* breached a fiduciary duty to disclose." (Emphasis added.)

### *Breach of fiduciary duty to "disclose known facts"*

Today the court affirms a judgment of over $5 million[8] on a brand-new tort, committable exclusively by insurance companies. The tort is called, "breach of a fiduciary duty to 'disclose known facts.' "[9] As I understand the majority opinion, this new "tortoid" is based on the insurance company's *refusing Powers' requests* "(1) for copies of photographs" [that were part of the claims investigations], (2) to be present when the Mikimbi was

---

[8]The judgment is for $47,236.29 for the breach of contract claim, $350,000.00 on the tort claims, and $5 million in punitive damages.

[9]There is no way of telling from the majority opinion whether an insurance company's breach of fiduciary duty to disclose tort is an independent tort or merely a corollary or "sub-tort" of the bad faith tort. Perhaps the strangest aspect of the majority opinion is its creation of this new tort not as a separate and "new cause of action" but "merely" as "part of the duty of good faith and fair dealing" tort. If I understand the majority opinion correctly, the breach of fiduciary relations tort is now a "component" of the bad faith tort. If withholding investigative photographs or other failures to "disclose" investigative materials is not an independent tort, then this court should not allow the judgment of over $5 million entered on this tort to stand. If, on the other hand, an insurance company's failure to "disclose" confidential investigative materials comprise a "component" of the bad faith tort, then I would "merely" express my hearty agreement with JUSTICE MAUPIN's concurring opinion, wherein he realizes that we must not take this case seriously and that it represents "an anomaly in this area of jurisprudence." I agree with the Justice that the creation of this tort or sub-tort, or whatever it is, is of doubtful, in any, precedential value and that the "bench and bar should be most careful in the future about drawing any sweeping conclusions from it."

raised and not telling him where the boat was until three days after USAA had possession; and (3) to seal the Mikimbi to protect evidence Powers needed to defend against allegations that he had intentionally sank [sic] his boat." Refusing "Powers' requests" does look like the kinds of conduct that would justify suing insurance companies in the future for breach of what I see as a non-existent "duty to disclose." Henceforth, insurance companies must hasten to open up their investigative files and not to "refuse" any requests for material contained in their files.

I would not, of course, disagree with the majority's saying that "the relationship between USAA and Powers was fiduciary in nature"; but to conjure a new and unnecessary tort action to be superimposed on the so-called "bad faith" tort is, I humbly suggest, a tortured jurisprudential solecism unknown to the law of torts and unique to the State of Nevada.

The trial court's instruction (No. 19), upon which this novel tort action is based, stated:

> In order to recover plaintiff must establish by a preponderance of evidence that a fiduciary relationship existed between plaintiff and defendant and that defendant breached a duty to disclose known facts to plaintiff.

There is no need to engage in a general discussion of the scope of fiduciary relationships that might arise out of insurance contracts because we are dealing with tort claims relating to a very narrowly-defined and specific duty, a duty that was described in the jury's instruction as the "duty to disclose known facts to plaintiff" in connection with USAA's investigation of possible insurance fraud on the part of Mr. Powers. Mr. Powers cites no authority to support his position that an insurer has a fiduciary "duty to disclose known facts" to its insured during its investigation of a suspected claim, much less authority to support the existence of a tort called "breach of the duty to disclose known facts." Even if some pertinent authority had been presented, I would have serious reservations about the judicial recognition of a tort based on an insurance company's refusal to disclose to a property claimant all of the "known facts" relating to an investigation of the claimant for fraud.[10]

When I examine the nature of Mr. Powers' duty-to-disclose tort claim in this case and take a look at the "known facts" alluded to by Mr. Powers, it becomes rather clear that Mr. Powers should

---

[10]*See* Martin v. State Farm Mut. Auto. Ins. Co., 960 F. Supp. 233 (D. Nev. 1997) (Although Nevada has recognized the special contractual relationship between insurer and insured, it has never classified the relationship as a fiduciary duty giving rise to a tort action for breach.).

not be allowed to recover tort damages arising out of a claim that USAA breached a duty to disclose facts. During fraud investigations of the kind instituted by USAA in this case, one would think that refusal to provide photographs or to permit the person being investigated to be present during the investigation would be a rather common and accepted circumstance. It is hard to envision a tort action's arising out of such normal, expected conduct on the part of insurance fraud investigators.[11]

If an insurance company's "breach of duty to disclose known facts" is not an independent and self-sufficient tort action, then the judgment of over $5 million should be reversed. If an insurance company's refusal to reveal investigative photographs is said by this court to be a "component" of the bad faith tort, then I dissent on the ground that such a judgment is (as put by JUSTICE MAUPIN) an unfounded "anomaly in this area of jurisprudence."

### Breach of the covenant of good faith and fair dealing

The jury was instructed that "an insurance company breaches its duty of good faith and fair dealing with its policyholder by refusal, *without proper cause,* to compensate its policyholder for a loss covered by the policy" and that "a denial of a claim in bad faith occurs when an insurance company fails, *without proper cause,* to pay the amount due under the insurance policy." (Emphasis added.) The jury was not instructed on the meaning of the phrase, "without proper cause."

The instruction on the tort of breach of the implied covenant of good faith and fair dealing given by the trial court is incomplete and fails to state the necessary elements of this tort. The vital element of the so-called "bad faith"[12] tort is the insurance company's *wrongful* conduct, not in merely denying a claim incorrectly and, therefore, without "proper" cause, but in denying the

---

[11]In asserting this tort claim, Mr. Powers complains because USAA refused, on demand, to provide him with certain evidentiary material, all of which was available through normal discovery procedures. Mr. Powers wants to mulct USAA in damages because they refused to divulge, upon Mr. Powers' demand, the confidential subject matter of USAA's investigation of misrepresentation and fraud on the part of Mr. Powers. What a dangerous precedent it would be if we were to allow compensatory and punitive damages to be awarded against insurance companies just because they do not respond to the demand of an under-investigation insured that the company provide photographs and exhibits that make up the company's fraud investigation of its insured.

[12]Use of the term "bad faith" in connection with the torts of breach of the implied covenant of good faith and fair dealing is sometimes criticized in the legal literature; nevertheless, I will use this abbreviated form throughout the opinion.

claim *wrongfully,* without any reasonable basis or with the knowledge that it is denying a rightful claim. *See* Falline v. GNLV Corp., 107 Nev. 1004, 823 P.2d 888 (1991). A mere incorrect or "improper" denial of a claim is not tortious. A company may, in the utmost of good faith and propriety, deny a claim, only to have it proven later, in court, that its denial of the claim was improper and that the claimant was, indeed, entitled to indemnity. Under the instruction as given, all an insurance company would have to do to become liable to its insured for commission of the bad faith tort would be to deny mistakenly a claim "without proper cause," that is to say, to deny a questionable claim that it should, properly, have paid—a rather common occurrence in the insurance world.

It is very hard to argue that "without proper cause" could have been understood by the jury to have meant denying the claim "unreasonably" or "with knowledge or reckless disregard of rightfulness of the claim." The instructions in this case gave no hint to the jury as to what the word "proper" meant in the context of the bad faith instruction. In the present case, the jury was not told what "proper cause" was; and the instruction seems to say, incorrectly, that when an insurance company denies a claim improperly (that is to say, in a manner with which the jury disagrees), then the claim has been denied "without proper cause." Mere denial of a claim "without proper cause," by itself, is insufficient to create tort liability. It is, of course, common knowledge that, occasionally, insurance companies make mistakes and deny disputed claims for which they are later held by a court to have incorrectly or "improperly" denied payment. These claims decisions, determined later to have been made incorrectly and thus without *proper* cause, cannot form the basis for tort actions for breach of the implied covenant of good faith and fair dealing.

This court ruled in Aluevich v. Harrah's, 99 Nev. 215, 217, 660 P.2d 986, 987 (1983), that there may be "a cause of action in tort for the breach of an implied covenant of good faith and fair dealing where an insurer fails to deal fairly and in good faith with its insured by refusing, *without proper cause,* to compensate its insured for a loss covered by the policy." (Emphasis added.) Insofar as *Aluevich* were to be read as holding that an action in tort can arise out of an insurance company's merely refusing to pay a claim, which refusal was later determined to have been made incorrectly or improperly, such a reading is not in accordance with the generally-accepted law relating to the bad faith tort. The quoted language in *Aluevich* does not include the essential element of intentional or reckless *wrongfulness* that must, in any

bad faith tort action, accompany the incorrect or "improper" denial of a claim. An insurance company's improper ("without proper cause") denial must be accompanied by an "actual or implied awareness of the absence of a reasonable basis for denying benefits of the policy." Am. Excess Ins. Co. v. MGM, 102 Nev. 601, 605, 729 P.2d 1352, 1354-55 (1986).

The quoted Instruction, No. 8, does not advise the jury that a mere incorrect or improper denial of an insurance claim (even if it is later made to appear that the insurer "improperly" failed to abide by its contractual obligation and did not, therefore, have a "proper" cause for denying the claim) is not, of itself, the basis for tort recovery. Tort liability for breach of the implied covenant of good faith and fair dealing appears to have been imposed in this case on the basis of an instruction that did not contain all of the essential elements of the tort; however, USAA did not object to the instruction and, thus, acceded to the jury's being drastically misinformed with regard to USAA's liability.

Although, as stated, USAA permitted this case to be decided by a misinstructed jury, this does not mean that USAA has no right to challenge the tort judgment under discussion. USAA argues in its brief that the evidence does not support a verdict for breach of the implied covenant of good faith and fair dealing. USAA further argues, correctly, that the "mere entitlement to contract damages . . . does not prove a breach of the duty of good faith and fair dealing." USAA also correctly argues that the "insured must also prove the unreasonableness of the position taken by the insurer" and that, in this case, Mr. Powers failed to prove this element of the tort. I agree with this argument.

In considering the bad faith tort judgment entered in this case, I note that the jury was instructed only with regard to one particular manner in which the good faith covenant was claimed to have been breached, namely, by USAA's "refusal" to pay Mr. Powers' claim. Accordingly, under the jury charge, USAA could not have been held liable for such conduct as untoward delay in payment or with bad faith which might have occurred *after* USAA's "refusal" to pay the claim (for example, the alleged "planting" of evidence by USAA in order to defeat Mr. Powers' claim). The reliance by the majority on such things as USAA's "investigation [being] improper, incomplete and poorly done, in violation of USAA's own procedures" is misplaced. Although a jury might have concluded that the firms with whom USAA contracted did an investigation that was incomplete or poorly done, this would not permit the jury in this case to bring in a bad faith verdict, because they were not instructed that liability could be based on a negligent investigation; and if they had, they would

have been, obviously, improperly instructed. Further, I note, the jury found for the insurance companies on Mr. Powers' unfair claim settlement policies suit.

The *only* basis for finding tort liability in this case, under the bad faith tort instruction given to the jury, is USAA's *refusal* to pay the claim, a refusal that was based on Mr. Powers' "false swearing" and misrepresentations or on USAA's legitimate belief that Mr. Powers had sunk his own boat.

In Falline v. GNLV Corp., 107 Nev. 1004, 823 P.2d 888 (1991), this court held that for there to be liability under this tort there must be an " 'absence of a reasonable basis for denying benefits . . . and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.' " *Id.* at 1009 (quoting Franks v. United States Fidelity & Guar. Co., 718 P.2d 193, 197 (Ariz. Ct. App. 1985) (quoting Noble v. National Am. Life Ins. Co., 624 P.2d 866 (Ariz. 1981) (en banc)). In order to establish a *prima facie* case for the tort of breach of the good faith covenant, then, Mr. Powers had to prove two elements of the tort, (1) that USAA had no reasonable grounds for refusing to pay the claim and (2) that USAA knew or recklessly disregarded the fact that there was no reasonable basis for refusing to pay the claim. There is no such proof in this record.

Aside from the problems inherent in the jury's receiving an incomplete instruction on the bad faith tort, the facts of this case fall short of supporting (even under a correct instruction) any version of bad faith tort liability arising out of USAA's *refusal* to pay this claim. Under the circumstances of this case, it is difficult to conceive of any scenario in which USAA could be held to have had no reasonable grounds to deny the claim or that it refused to pay a knowingly rightful claim with an awareness that it had no reasonable grounds to deny the claim. USAA had been advised, shortly before its formal, written denial of the claim, by independent attorney/investigator, Mr. von Spiegelfeld, that "Mr. Powers' statements are very inconsistent and make little sense." Mr. von Spiegelfeld, an independent evaluator of the Powers claim, advised USAA "that Mr. Powers' claim should be denied and that the bases for denial should be that the loss was 'caused intentionally by or at the direction of a covered person,' " and "that the policy should be voided by the 'false swearing, concealment or misrepresentation of any material facts by any covered person.' " Unless some guilty complicity between Mr. von Spiegelfeld and USAA were shown, the von Spiegelfeld letter provides virtually unopposable evidence that USAA was not acting with the wrongful awareness that there was no "reasonable basis for denying benefits of a policy." *See MGM,* 102 Nev. at 605, 729 P.2d at 1354-55.

We must continue to be mindful that Mr. Powers *lied* to USAA and that he did not tell the truth until he felt threatened by USAA's plan to raise the boat from the bottom of the sea. USAA was dealing with a self-admitted liar. This alone prompted further inquiry on the part of USAA. When this is added to USAA's evaluation of the physical evidence and Mr. Powers' multiple inconsistent and implausible versions of the sinking, USAA had what appears to me to be sound reason to exercise caution in dealing with this claim. All in all, it is very difficult to find in this record any indication that USAA knew that Mr. Powers had a valid claim and that it, nevertheless, knowingly or recklessly denied the claim in the knowledge that it was dealing with a rightful claim.

USAA argues, and I agree, that liability on Mr. Powers' bad faith claim cannot be sustained if USAA's denial was accompanied by legitimate factual or legal issues regarding the validity of the claim. *See Falline,* 107 Nev. 1004, 823 P.2d 888; National Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala. 1982) ("[I]f the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."). In deciding to "refuse" to honor Mr. Powers' claim, USAA had to deal with a number of factual issues[13] relating to whether Mr. Powers intentionally scuttled his boat and with a critical legal issue as to whether Mr. Powers' false misrepresentations and concealments were "material" under the terms of the policy.

It is worth noting that the trial judge, after hearing all the evidence, did not see this as a bad faith case. While discussing the issue of attorney's fees, the trial judge made the following comment:

> I've already indicated that I thought [USAA] defended in good faith.
>
> I can't find that the insurance company defended this without reasonable grounds because of . . . several factors involved. [T]here was a possibility that he could have sunk the boat himself, and so there is some conflicting evidence to that

---

[13]Early on in its investigation USAA suspected that Mr. Powers was lying and that perhaps he may have sunk his own boat to get the insurance money. USAA's suspicions were heightened when its investigations disclosed that Mr. Powers was deeply in debt and that he owed $30,000.00 to his former wife. One of the insurance investigation reports indicated that Mr. Powers was "obviously strapped for money and desperate. Repeatedly Mr. Powers asserted that he would have to file for bankruptcy soon." The company was also aware that Mr. Powers had been trying unsuccessfully to sell his boat in order to pay off his debts.

effect, so I can't find that the insurance company defended in bad faith.

It is difficult indeed to challenge the trial court's perception of this case; and it is rather obvious that USAA had, of necessity, been struggling with a number of legitimate factual issues by the time it finally decided to deny this claim. In making its decision to deny coverage, USAA also had to deal with legitimate legal issues relating to the materiality of Mr. Powers' false accounts of the sinking.

Although it is rather clear that USAA made its decision to "refuse" this claim on the basis of many legitimate factual and legal issues, Mr. Powers was able to find an "expert" who was willing to offer an opinion relating to the ultimate liability issue, namely, whether USAA was guilty of committing the tort of breach of the covenant of good faith and fair dealing. This opinion evidence was offered in the form of expert testimony by Mr. Patrick Fitzgibbons, the same Mr. Fitzgibbons that told the jury that Mr. Powers' lying to his insurance company about how his boat sank was not "material." Mr. Fitzgibbons took the stand in this regard and was asked the question:

> Can you tell this jury what *facts* that you gleaned from your review of USAA's file handling of Colonel Powers claim that would breach the covenant of good faith and fair dealing? [Emphasis added.]

Mr. Fitzgibbons evaded the question entirely and gave the following answer to the question:

> Yes, The implied covenant of good faith and fair dealing is something that is created by the law to try to equalize— (answer discontinued because of objection)

To get Mr. Fitzgibbons back on track, Mr. Powers' attorney asked Mr. Fitzgibbons a leading question which is remarkably like the proverbial, "Have you stopped beating your wife?" Without ever asking Mr. Fitzgibbons if, in his opinion, USAA had breached its duty of good faith, Mr. Powers' counsel asked Mr. Fitzgibbons to tell the jury *how* USAA had breached its good-faith duty to Mr. Powers. The question was put to Mr. Fitzgibbons in this way:

> What did USAA do by way of breaching its covenant of good faith and fair dealing in this case?

Mr. Fitzgibbons gave the following answer:

> All right. USAA had a 22-year member, been insured with USAA for 22 years, a retired colonel in the Air Force who

had only made, in that 22 years' time, as I recall, one prior claim. And that was when his automobile was hit by an airplane that was trying to land. Colonel Powers lost his yacht, which he had done most of the work on this yacht, building this yacht himself, put in a great deal of time, effort, and expense. He turned in this claim to USAA within three or four days after the yacht sank.

And in my opinion, USAA should have taken this claim in good faith. They should have paid this claim within 30 days on it being reported to them, and this is what they are required to do by this particular statute, to deal with their insured in good faith and fairly.

Based on the facts recited by Mr. Fitzgibbons, namely, that Mr. Powers had been with USAA for twenty-two years and had made only one claim, was a retired colonel, had "lost his yacht," had done most of the work on the yacht, and had turned in his claim within three or four days, Mr. Fitzgibbons testified that "USAA should have taken this claim in good faith" and that it "should have paid this claim within 30 days."[14]

The issue, of course, is whether USAA acted *reasonably*; and even if attorneys were to be allowed to testify as to whether insurance companies were guilty of tortious, bad faith conduct, it is obvious that Mr. Fitzgibbons had no rational basis for his opinion.

Unless I misread Mr. Fitzgibbons' opinion, he is telling the jury that USAA should have paid this claim, and within thirty days, because Mr. Powers was with the company for twenty-two years, was a retired colonel, did most of the work on his own yacht and made his claim within three or four days.

Mr. Fitzgibbons' opinion that USAA should have paid the fraudulent claim within thirty days of the time that Mr. Powers made it highlights the overall untenability and extravagance of the Fitzgibbons testimony. With a lying claimant who ultimately was indicted by a federal grand jury for insurance fraud, no insurance company could be expected to pay such a claim "within 30 days." Mr. Fitzgibbons' testimony is the only evidence upon which the jury could have reasonably relied in support of Mr.

---

[14]Mr. Fitzgibbons also told the jury that when a jury in an earlier criminal proceeding acquitted Powers of intentionally scuttling his boat, USAA "should have paid the claim promptly at that point and apologized to Colonel Powers for what they caused to be done to him." This opinion, of course, ignores the material misrepresentation ground for denying the claim and seems to assume that the acquittal represents an adjudication of the merits of USAA's position in this case. This opinion is, on its face, of no validity.

Powers' tort claim, and his testimony is clearly insufficient for its intended purpose.[15]

Finally, Mr. Fitzgibbons' opinion that USAA "should have taken this claim in good faith" certainly does not provide evidence which would support a jury verdict based on USAA's having breached the implied covenant of good faith and fair dealing. Obviously, USAA could have denied this claim when it "should have" paid it, without being guilty of bad faith. It could have merely incorrectly, but in good faith, denied a disputed claim. To provide evidence of bad faith conduct, Mr. Fitzgibbons would have had to have testified not only that USAA *should have* taken the claim, but that its failure to accept the claim was accompanied by a wrongful and knowing denial of the claim, a knowing denial of a claim that the company knew or should have known was a valid claim. Merely stating that USAA "should have taken this claim in good faith" does not furnish a *prima facie* case for tort liability in this case.[16]

Mr. Powers failed to make a *prima facie* case for the tort of

---

[15]In his reply brief, Mr. Powers argues that there is "ample evidence to support this jury's verdict." Mr. Powers then cites in his brief only two bases for his contention that he was entitled to recover tort damages. One is the Fitzgibbons testimony; the other is the testimony of James Hall, "an expert in the field of managing investigations." According to the brief, Mr. Hall "explained in detail how USAA's investigation had been improper, incomplete, poorly done, and in violation of USAA's procedures." A showing that USAA employed sloppy investigating procedures does not tend to show that USAA had no reasonable grounds for disputing coverage or that it knew (or recklessly disregarded) that there was no reasonable basis for disputing coverage. If Mr. Fitzgibbons' testimony fails to furnish a *prima facie* tort case, there is no tort case. There is no tort case.

[16]I note that in United Fire Insurance Co. v. McClelland, 105 Nev. 504, 510 n.1, 780 P.2d 193, 196-97 n.1 (1989), this court approved an expert's opinion that the company was (1) "responsible to the policy holder[]" and (2) knew that it should pay that claim. If Mr. Fitzgibbons had testified not only that USAA "should have taken the claim" but *also* that USAA "knew that it should pay the claim," but refused, nonetheless to do so, then such testimony would have formed the basis for a *prima facie* tort liability in this case. He did not so testify.

I would note in passing that in *United Fire Insurance* the witness testified that the insurance company was "guilty of bad faith, and was liable for punitive damages." *Id.* at 510, 780 P.2d at 196-97. This testimony was given on rebuttal to counter previous testimony offered by the insurance company relating to the witness' previous deposition testimony that he "had not seen any conduct on the part of appellant that warranted punitive damages." *Id.* at 510, 780 P.2d at 197. The holding in *United Fire Insurance* should not be taken as authority for the proposition that Mr. Fitzgibbons would be allowed to testify on direct examination that, in his opinion, USAA was guilty of commission of the bad faith tort and was liable to Mr. Powers for punitive damages.

breach of the implied covenant of good faith and fair dealing. Having failed in his proof, I would reverse Mr. Powers' tort judgment for breach of the implied covenant of good faith and fair dealing.