ROBERTA HOOPES aka ROBERTA JONES, Appellant, *v.*
LONNIE LEE HAMMARGREN, M.D., Respondent.

No. 15394

September 19, 1986                    725 P.2d 238

*Gang & Berkley,* Las Vegas, for Appellant.

*Galatz, Earl & Catalano* and *Daniel F. Polsenberg,* Las Vegas,
for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

This is an appeal from a summary judgment granted in favor of respondent, Dr. Lonnie Hammargren. While Dr. Hammargren asserts that his alleged conduct did not constitute actionable malpractice, Ms. Hoopes contends that there are genuine issues of fact to be decided at trial relating to her claim of malpractice (which include misdiagnosis, mistreatment and sexual advantage of the physician-patient relationship). Further, while Hammargren urges that Ms. Hoopes' action was untimely filed, she argues on appeal that her action is not barred by the controlling statute of limitations. We agree with Ms. Hoopes.

Our review of the record indicates that Ms. Hoopes' cause of action was timely filed. Additionally, we have determined Dr. Hammargren was not entitled to judgment as a matter of law on the claims of mistreatment and sexual advantage of the physician-patient relationship. Accordingly, we reverse in part and affirm in part.

## FACTS AND PROCEDURAL HISTORY

In March, 1972, Ms. Hoopes was referred to Dr. Hammargren (a neurosurgeon) for evaluation of numbness in the back and legs. Dr. Hammargren hospitalized Ms. Hoopes for a diagnostic evaluation and, pursuant to this, informed her that she suffered from multiple sclerosis.[1] The record indicates Dr. Hammargren told Ms. Hoopes that the disease was serious and involved deterioration of the nervous system, and that Ms. Hoopes responded she would "do anything you ask me to—just let me keep walking."

Dr. Hammargren continued to treat Ms. Hoopes on an outpatient basis. According to the record now before us, he recognized the emotional lability frequently associated with multiple sclerosis and told Ms. Hoopes it was important that she never be upset "because the disease will attack your nervous system." Accepting the evidence of Ms. Hoopes, Dr. Hammargren explained this was why the medications he prescribed were so important. To this end, evidently, Ms. Hoopes received numerous prescriptions for quaaludes, valium, elavil, triavil, meprobamate, chloral hydrate, phenobarbitol, seconal, and talwin, while under the care of Dr. Hammargren.[2]

Two to three months after Ms. Hoopes' initial visit to Dr. Hammargren, the record indicates he phoned her at home and invited her to have dinner, saying his wife was out of town and he was lonely. After dinner he invited her into his office "to see his iguanas," and they had sexual intercourse. Ms. Hoopes claims this sexual relationship continued until 1977 (with the exception of a six-month period when Ms. Hoopes was married and was residing out-of-state). There were never any other social engagements. Dr. Hammargren always came to Ms. Hoopes' home. She claims the relationship was based solely on sex and Dr. Hammargren visited on an average of once monthly. Although Ms. Hoopes admitted Dr. Hammargren never told her that the sexual intercourse constituted a part of any treatment plan, she claims she feared to object. She asserts she felt that Dr. Hammargren might become angry and terminate their physician-patient relationship and that "he was the reason I was alive and I didn't want

---

[1] "A slowly progressive disease of the central nervous system characterized pathologically by disseminated patches of demyelinization [destruction of the sheath surrounding nerve tissue] in the brain and spinal cord, and clinically by multiple symptoms and signs with remissions and exacerbations." Common symptoms include visual disturbances, weakness, interference with walking, difficulties with bladder control, and mild emotional disturbances. *The Merck Manual* at 1339-40 (12th ed. 1972).

[2] Most of these drugs are potent central nervous system depressants with recognized potential for physical and psychological dependence. Many produce withdrawal symptoms when taken for a period of time and then abruptly stopped. Physician's Desk Reference (39th ed. 1985).

to upset this man or make him feel like I didn't like him or anything."

Dr. Hammargren admits having had a sexual relationship with Ms. Hoopes, but contends it began in 1976 and involved only three or four encounters. Although Ms. Hoopes testified that Dr. Hammargren would usually bring quaaludes or chloral hydrate when he came to her home for sexual gratification, Dr. Hammargren was unable to recall whether he provided drugs during these encounters.

Dr. Hammargren claims he considered Ms. Hoopes a girl friend rather than a patient. Their sexual encounters were social and he did not intend therapeutic benefit. Dr. Hammargren says he did not feel this sexual relationship would affect Ms. Hoopes emotionally although he conceded that emotional lability is generally increased in patients suffering from multiple sclerosis.

Dr. Hammargren claims that after his initial evaluations of Ms. Hoopes, he concluded that she probably abused drugs. In spite of this, his office records reflect that Ms. Hoopes was provided numerous prescriptions for various tranquilizers and sedatives (many with the potential for abuse and acquired dependence). Dr. Hammargren claims that many refills were provided by his office staff without his approval. He monitored the drugs provided to his patients "to a degree only." He also admits having "a select few group of patients that were sort of the people that get special favors because they were there in 1971 or '72 right when I got started."

Ms. Hoopes acknowledges that she did not try to avoid taking the drugs prescribed for her. She claims she believed "that was the reason I was not laying out in a wheelchair, the way other people with multiple sclerosis were." In the fall of 1977, Ms. Hoopes moved to Louisville, Kentucky, in order to be married. After requesting these medications from a doctor there, she was told that "he didn't write prescriptions like that." According to Ms. Hoopes, this caused her to suspect that perhaps Dr. Hammargren's treatment was not an acceptable treatment for multiple sclerosis. In 1979, as she continued to experience some numbness, she chose to be evaluated by experts at the Sansum Clinic in Santa Barbara, California. There, Dr. James B. Connors told her she exhibited no signs or symptoms consistent with a diagnosis of multiple sclerosis. Follow-up examinations confirmed this finding.

At the hearing on his motion for summary judgment, Dr. Hammargren presented no expert testimony in support of his position. Rather, he relied on his own testimony given through a deposition. Ms. Hoopes relied on the deposition of Dr. Connors to oppose Dr. Hammargren's motion for summary judgment. As to the alleged misdiagnosis, Dr. Connors testified that he thought

it was reasonable for Dr. Hammargren to have considered a diagnosis of multiple sclerosis (among other diagnoses), but that repeated evaluations at Sansum Clinic never revealed any evidence of the disease. Dr. Connors had obtained very little history concerning drug usage by Ms. Hoopes; thus, he rendered no opinion on the alleged mistreatment.

The district court issued an order granting summary judgment but failed to explain its reasoning. At the hearing on the motion, however, the court had indicated a belief that the diagnosis rendered by Dr. Hammargren was not unreasonable, that there was no evidence of improper prescription, and that Dr. Hammargren did not maintain a standard of care below that expected of him as a physician. The court appeared to recognize there were ethical considerations which might warrant attention, but deemed the district court to be an improper forum to address such issues. The court did not address the statute of limitations bar raised by Dr. Hammargren.

## STANDARD OF REVIEW

In a medical malpractice action (as in any court action), summary judgment is appropriate only where the moving party has shown no genuine issue of material fact. The moving party claims that he is entitled to judgment as a matter of law. NRCP 56(c). In reviewing an order granting summary judgment, this court will consider all evidence in a light most favorable to the party against whom the motion is granted. Mullis v. Nevada National Bank, 98 Nev. 510, 512, 654 P.2d 533, 535 (1982); Orcutt v. Miller, 95 Nev. 408, 411, 595 P.2d 1191, 1193 (1979).

The issue before us is whether the district court erred in granting the summary judgment motion. In light of the facts of this case, we must decide if the district court properly concluded that, as a matter of law, Dr. Hammargren's conduct did *not* fall below the acceptable standard of care.[3]

---

[3]Utilizing the criteria established in Massey v. Litton, 99 Nev. 723, 726, 728, 669 P.2d 284, 251, 252 (1983), we have determined this cause of action to be timely filed. The date of discovery of the injuries (for purposes of calculating the statute of limitations) is July 23, 1979. This was the date Ms. Hoopes was told she was *not* suffering from multiple sclerosis. As required by NRS 41A.070 (repealed July 1, 1981), Ms. Hoopes filed a petition with Nevada's medical-legal screening panel on May 21, 1981 (twenty-two months after discovery of the injuries). Subsequent to the filing of the petition, the screening panel requirement was abolished. In abolishing this prerequisite to the filing of a civil complaint, however, the legislature provided a six-month tolling period effective July 1, 1981. 1981 Nev. Stats. ch. 327 § 16 at 599. Thus, Ms. Hoopes had six months from the date of repeal to file her claim. A complaint was filed on September 14, 1981, and was well within the tolled period of time.

## CLAIM OF MISDIAGNOSIS

Ms. Hoopes claims that Dr. Hammargren negligently misdiagnosed her illness. At the hearing on the motion for summary judgment, Dr. Hammargren relied on his own deposition. He did not produce other expert evidence to support compliance with the applicable standard of care. Ms. Hoopes' expert, however, acknowledged via his deposition that although he found no evidence to show Ms. Hoopes suffered from multiple sclerosis, it was not unreasonable for Dr. Hammargren to have reached this diagnosis.

Therefore, based on the testimony of Ms. Hoopes' own expert, there is no genuine issue of material. fact related to the claim of negligent misdiagnosis. Hence, on this claim for relief, the district court correctly ruled that Dr. Hammargren was entitled to judgment as a matter of law.

## CLAIM OF MISTREATMENT

Ms. Hoopes next claims that Dr. Hammargren was negligent in his treatment modalities. She asserts that the prescriptions for various drugs on a frequent basis was improper.

The fact that Dr. Hammargren prescribed various drugs to Ms. Hoopes is not in dispute. Dr. Hammargren admitted that he monitored drugs prescribed from his office "to a degree only." Ms. Hoopes claimed that when Dr. Hammargren would come to her home for a sexual encounter, he would bring a number of drugs. Most often, she says, he brought quaaludes. Dr. Hammargren admitted that he was unable to recall whether or not he provided any drugs during these encounters.

On appeal, Dr. Hammargren asserts that Ms. Hoopes' expert testified that his "methods [of treatment] were appropriate." Our review of the record, however, reveals that Dr. Connors (Hoopes' expert) addressed only the issue of negligent misdiagnosis. Additionally, Dr. Hammargren failed to introduce evidence to show that the prescriptions for various drugs were consistent with the applicable standard of care. Therefore, the record is devoid of evidence to support the district court's ruling that Dr. Hammargren's treatment modality was appropriate.

Accordingly, we cannot say that the district court's ruling was correct. We feel there are genuine issues of material fact related to the claim of mistreatment.

## CLAIM OF SEXUAL ADVANTAGE

Ms. Hoopes next claims that Dr. Hammargren used the physician-patient relationship to induce her into a sexual relation-

ship and that such conduct constitutes malpractice. While Dr. Hammargren does not dispute the existence of the sexual relationship, he asserts it cannot constitute a basis for a cause of action grounded upon professional malpractice. We disagree.

A fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith. Barbara A. v. John G., 193 Cal.Rptr. 422, 431 (Ct.App. 1983). "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, since the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Id.* at 432.

This court has recognized that the physician-patient relationship is "fiduciary in nature." Massey v. Litton, 99 Nev. 723, 728, 669 P.2d 248, 252 (1983) (citation omitted). The physician-patient relationship is based on trust and confidence. Society has placed physicians in an elevated position of trust, and, therefore, the physician is obligated to exercise utmost good faith. While Dr. Hammargren urges this court to limit this type of claim to physicians practicing psychiatry, we believe the fiduciary relationship and the position of trust occupied by *all* physicians demands that the standard apply to all physicians. *See also* Lochett v. Goodill, 430 P.2d 589, 591 (Wash. 1967).

A patient generally seeks the assistance of a physician in order to resolve a medical problem. The patient expects that the physician can achieve such resolution. Occasionally (due to illness), the patient is emotionally unstable and often vulnerable. There is the hope that the physician possesses unlimited powers. It is at this point in the professional relationship that there is the potential and opportunity for the physician to take advantage of the patient's vulnerabilities. To do so, however, would violate a trust and constitute an abuse of power. This court would condemn any such type of exploitation. Such conduct would fall below the acceptable standard for a fiduciary.

Historically, the physician's primary obligation has been, above all, to do no harm. It is Ms. Hoopes' contention that Dr. Hammargren abused the physician-patient relationship by instigating a sexual relationship.

First, we note that the district court deemed the judiciary an improper forum to address such issues. We disagree. While Dr. Hammargren may also be subject to professional sanctioning, Ms. Hoopes has the right to seek redress in the courts. Cotton v. Kambly, 300 N.W.2d 627, 629 (Mich.App. 1980); Roy v. Har-

togs, 366 N.Y.S.2d 297, 301 (Civ.Ct. 1975). Sexual advantage of the physician-patient relationship can constitute malpractice.

Next, having concluded that Ms. Hoopes is entitled to include exploitation of the physician-patient relationship in her malpractice action, we shall examine the criterion upon which such an allegation may be based. It is incumbent upon Ms. Hoopes to prove, by a preponderance of the evidence, that Dr. Hammargren violated his fiduciary responsibilities. In order to do so, Ms. Hoopes must show that Dr. Hammargren held a superior authoritative position in the professional relationship and that, as a result of her illness, she was vulnerable. Additionally, Ms. Hoopes must show that Dr. Hammargren exploited the vulnerability. The nature and extent of the circumstances surrounding the alleged exploitation must be carefully examined. For example, we will not presume that Ms. Hoopes was incapable of giving consent. The sexual relationship which admittedly existed could have been personal and unrelated to the parameters of treatment. Additionally, a jury might determine that the physician-patient relationship had terminated prior to certain of the alleged sexual encounters. We also caution that Ms. Hoopes not only is required to prove exploitation, but also that it was the proximate cause of any claimed harm.[4]

Here, in support of his motion for summary judgment, Dr. Hammargren offered no evidence (other than his deposition) to show that he did not exploit the physician-patient relationship. In fact, we note that Dr. Hammargren conceded that sexual encounters during the course of such a professional relationship "is not good medical practice." Accordingly, it was error for the district court to grant summary judgment in favor of Dr. Hammargren on this claim.

The order of the district court granting summary judgment in favor of Dr. Hammargren is reversed as to Ms. Hoopes' claims of mistreatment and sexual advantage of the physician-patient relationship. As to Ms. Hoopes' claim of misdiagnosis, the order of the district court is affirmed. Additionally, we find the filing of the civil action to be timely.

SPRINGER, C. J., and MOWBRAY and YOUNG, JJ.,[5] concur.

---

[4]Within the foregoing parameters, it will be incumbent on the trial judge to develop an appropriate set of jury instructions compatible with established legal principles that govern the physician-patient relationship.

[5]THE HONORABLE JUSTICE THOMAS STEFFEN voluntarily disqualified himself from participation in this case.