2002 OK CIV APP 103

**Clesta DARNABY and Jeff Darnaby, Plaintiffs/Appellants,**

v.

**Martin J. DAVIS, D.O., Defendant/Appellee.**

No. 94,523.

Court of Civil Appeals of Oklahoma, Division No. 2.

March 19, 2002.

Rehearing Denied June 4, 2002.

Certiorari Denied Oct. 15, 2002.

Keith A. Ward, Stephanie Dinsmore Phipps, Richardson, Stoops, Richardson & Ward, Tulsa, for Plaintiffs/Appellants.

Bruce A. McKenna, Holden, Glendening & McKenna, Tulsa, for Defendant/Appellee.

GOODMAN, Presiding J.

¶ 1   This is Clesta (Patient) and Jeff Darnaby's appeal from the trial court's March 13, 2000, order entering judgment on a jury verdict rendered in favor of Martin J. Davis, D.O. (Doctor), on Patient's claim of negligence and battery arising out of sexual encounters which took place in Doctor's office. Patient contends the trial court erred when it failed to grant judgment to her as a matter of law on the issue of whether Doctor was treating Patient after Doctor admitted the existence of a doctor-patient relationship at the time of the encounters.   Patient also contends the trial court improperly instructed the jury.   Based upon our review of the appellate record and applicable law, we reverse and remand the matter for a new trial.

## FACTS

¶ 2   Doctor, a general practitioner, began medically treating Patient in 1990 for complaints of anxiety and chest pains and, later,

for monopolar depression. He continued as her physician until 1996. Doctor initially prescribed medication for Patient to treat her conditions. When Doctor determined Patient's psychological problems were more complex, he referred her to a psychiatrist in 1992, who diagnosed Patient as having Post–Traumatic Stress Disorder and Multiple Personality Disorder. Patient stopped seeing the psychiatrist after 4 months. Doctor admitted he continued to treat her for her emotional states, but denied he was treating her for psychological conditions.

¶ 3   In August 1995, Doctor, acting as Patient's medical "gatekeeper" *i.e.,* one responsible for coordinating all her medical treatment rendered by himself and other medical professionals, admitted to having two sexual contacts with Patient in his office. Prior to that time, Doctor and Patient had engaged in kissing in Doctor's office. Also, by May of 1995, Patient had told Doctor she had formed a strong personal attachment to him.

¶ 4   In 1996, the Oklahoma State Board of Osteopathic Examiners (OSBOE) investigated Doctor's conduct and temporarily suspended him from the practice of medicine. An order from the OSBOE dated October 23, 1996, recited that Doctor had "established a physician-patient relationship with Patient, which continued until 1996" and found that Doctor "engaged in sexual activity within this physician-patient relationship."

¶ 5   Patient sued Doctor on June 18, 1997, for negligence and sexual battery. Doctor defended his actions by stating that his relationship with Patient had become personal, and was not treatment, though he admitted a physician-patient relationship existed at the time in order to act as her gatekeeper. The trial court instructed the jury that it could find Doctor was in a physician-patient relationship with Patient, yet not be "treating" her. Patient claims this was error.

## ISSUES

¶ 6   Patient's brief in chief preserves two issues on appeal: Whether the trial court erred when it refused to grant judgment to her as a matter of law on the issue of whether Doctor was treating Patient once Doctor admitted the existence of a physician-patient relationship, and whether the trial court thereafter properly instructed the jury on that issue.

## ANALYSIS

Is Sex Between Parties to a Doctor–Patient Relationship Ipso Facto Actionable?

¶ 7   Patient's appellate brief states "there is no distinction between 'treatment' and a 'physician-patient relationship' and the use of the term 'treatment' merely confused the jury" which statement provides the framework of our analysis.

¶ 8   Thus, we must first determine whether or not sexual contact between a doctor and his or her patient is actionable in this state. If such contact is always actionable, we would have to conclude that the distinction between the existence of a doctor-patient relationship and the treatment of a patient is artificial and meaningless, and would automatically grant Patient judgment. In other words, if a sexual act between the two parties in a doctor-patient relationship, standing alone, creates a cause of action, it follows that it makes no difference whether the act of sex was part of the medical regimen.

¶ 9   On the other hand, if the existence of a doctor-patient relationship is beyond dispute—as in this case—yet sexual contact between a doctor and a patient is not actionable per se, then we would have to conclude that there is a distinction between the doctor-patient relationship and treatment, and that the trial court correctly instructed the jury to consider such distinction.

¶ 10   Initially, we note that we are not addressing the professional ethics of sexual contact between a medical professional and a patient, which is universally condemned. Nor do we address sexual contact of a criminal nature. Our inquiry is limited to the facts of this case—sexual contact between a physician and his adult, female patient.

¶ 11   Further, we do not address the medico-legal issues rising from the doctor-patient relationship between a psychiatrist, psychologist, or other mental health counseling professional, and a patient. These cases involve

the phenomenon of transference.[1] Many courts recognize a cause of action against a mental health care provider who engages in sexual acts with a patient because such conduct is evidence of the professional's mishandling of the transference phenomenon, which is a recognized risk in this field. For a discussion of this issue, *see Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986). As discussed later, the transference phenomenon is not usually recognized as occurring in a non-psychological treatment situation.[2]

¶ 12 There are no Oklahoma cases that directly address the issue of whether or not sexual contact between a doctor and a patient is actionable.[3] However, other jurisdictions have addressed the issue.

¶ 13 These cases fall into three broad categories. The first and largest category is best described as those cases which hold that, absent proof that a physician used sex as a treatment modality, the mere fact of sexual contact between the physician and the patient is not actionable. The second category involves physicians who used sex as a treatment modality. These cases hold that the physician can be held liable for substandard professional services. The last category of cases are those in which a non-psychiatrist/psychologist physician became so involved with a patient that the physician effectively took on the role of a psychiatrist, and mishandled the resulting transference phenomenon.

¶ 14 We will now address each category.

## Category I—Sex Within Doctor–Patient Relationship Without Treatment Not Actionable

¶ 15 The court in *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986), after surveying various other jurisdictions, stated: "We note that courts do not routinely impose liability upon physicians in general for sexual contact with patients." *Id.* at 1366. *See, e.g., Smith v. St. Paul Fire and Marine Ins. Co.*, 353 N.W.2d 130, 132 (Minn.1984).

¶ 16 In *Odegard v. Finne*, 500 N.W.2d 140, 143 (Minn.Ct.App.1993), the court, surveying other jurisdictions, noted:

The general rule is that a medical malpractice claim cannot be based upon a sexual relationship between a physician and a patient being treated by the physician for a physical condition. *E.g., Simmons*, 805 F.2d at 1366 ("We note that courts do not routinely impose liability upon physicians in general for sexual contact with patients," citing *Smith*, 353 N.W.2d at 130.); *Atienza v. Taub*, 194 Cal.App.3d 388, 239 Cal.Rptr. 454, 457 (1987) ("In examining out-of-state authorities, we find that allegations of a physician's sexual misconduct have provided a basis for a malpractice action only where the patient has alleged that the physician induced sexual relations as part of the therapy."), *pet. for rev. denied* (Cal. Nov. 12, 1987); *Collins*, 604 N.E.2d at 1196 ("The general rule is that a physician's sexual relationship with a patient does not constitute rendition of health

---

1. Transference has been defined as " '[t]he process whereby the patient displaces on to the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly.' " *St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 700 (Minn. 1990) (quoting S. Waldron–Skinner, *A Dictionary of Psychotherapy* 364 (1986)). "The patient, required to reveal her innermost feelings and thoughts to the therapist, develops an intense, intimate relationship with her therapist and often 'falls in love' with him." *Id.* Even though transference is not confined solely to psychiatric treatment and the mental health profession, it has generally been accepted that mental health professionals expect and even elicit this phenomenon as a regular and accepted part of treatment. *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000).

2. We note that "[t]ransference is not a recognized component in the medical treatment of physical conditions." *Odegard v. Finne*, 500 N.W.2d 140, 143 (Minn.Ct.App.1993). *See also Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000).

3. The Oklahoma Supreme Court in *Bladen v. First Presbyterian Church*, 1993 OK 105, 857 P.2d 789, does address the issue of whether a minister who engages in an adulterous affair with a married woman, while providing marital counseling to her and her husband has committed a tort. The *Bladen* court concluded the husband did not have a legally cognizable cause of action for clergy malpractice or seduction. We discuss *Bladen* elsewhere in this opinion.

care services, and is not actionable as malpractice," citing *Smith*, 353 N.W.2d at 130.).

¶ 17 In *Lindheimer v. St. Paul Fire and Marine Insurance Co.*, 643 So.2d 636 (Fla. Dist.Ct.App.1994), the court stated that the fact the unwanted sexual contact took place in the medical professional's office does not automatically "transmute the act into a professional service." *Id.* at 638. Rather, there must be some causal connection between the act itself and the doctor-patient relationship.

¶ 18 In *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607, 615 (2000), the court held:

We conclude, based on the foregoing rationale, that there must be a causal relationship between the alleged harm and the complained-of professional act or service. When there is a claim of medical malpractice based on unwanted sexual contact, the determination of liability should focus not solely on the locale of the alleged harm or the professional status of the actor, but, rather, on the context of the alleged medical service involved in the action. In other words, it is the physician's deviation from the recognized medical standard of care *during the course of treatment* that is the essence of a claim for medical malpractice, and there must exist a causal relationship between the alleged harm and the complained-of deviation from that standard of care in order for liability to attach.

¶ 19 The court in *Collins v. Covenant Mutual Insurance Co.*, 604 N.E.2d 1190, 1195–96 (Ind.Ct.App.1992), stated:

With respect to a typical physician's sexual conduct, different reasoning has been adopted. The general rule is that a physician's sexual relationship with a patient does not constitute rendition of health care services, and is not actionable as medical malpractice. *See Standlee v. St. Paul Fire & Marine Ins. Co.* (Ct.App.1984), 107 Idaho 899, 693 P.2d 1101; *Hirst v. St. Paul Fire & Marine Ins. Co.* (Ct.App.1984), 106 Idaho 792, 683 P.2d 440; *St. Paul Fire & Marine Ins. Co. v. Quintana* (1988), 165 Mich.App. 719, 419 N.W.2d 60; *Smith v. St. Paul Fire & Marine Ins. Co.* (1984), Minn., 353 N.W.2d 130; *South Carolina Medical Malpractice Liab. Ins. Joint Underwriting Ass'n v. Ferry* (1987), 291 S.C. 460, 354 S.E.2d 378; *Washington Ins. Guar. Ass'n v. Hicks* (1987), 49 Wash.App. 623, 744 P.2d 625.

¶ 20 We therefore conclude, based upon the authorities set out above, among others, that there must be some causal connection between the sexual activity within a doctor-patient relationship and the alleged damages resulting from the substandard professional medical care. That causal connection, in our opinion, is treatment.

¶ 21 We conclude that sexual activity between a doctor and a patient, notwithstanding the existence of a doctor-patient relationship, without more, does not give rise to a cause of action. In order to impose liability, a patient must prove that the sexual activity was represented by the doctor to be part of the treatment regimen, and the combination of a physician using sex as a treatment modality in the doctor-patient relationship resulted in damage to the patient.

### Category II—Liability Imposed Because Sex Presented as Treatment

¶ 22 The second category of cases are those that have found that the physician represented to the patient that some sort of sexual contact was part of the treatment regimen. In those instances, the physician can be liable for such acts.

¶ 23 In *Hoopes v. Hammargren*, 102 Nev. 425, 725 P.2d 238 (1986), the court held that if a patient could prove a physician used sex to breach a fiduciary duty to that patient, a cause of action could be pursued. The Nevada court further held that a physician-patient relationship was fiduciary in nature, and taking sexual advantage of that relationship could constitute professional malpractice. The court emphasized that the patient must still prove the elements of such a violation of a fiduciary relationship, *i.e.*, that the physician was in an authoritative position and, as a result of some illness, emotional instability, or other vulnerability, the physician exploited a condition of the patient. Thus, consensual sex, the prior termination of the physician-patient relationship, or the lack of a causal connection between the sex

act and the claimed damages, would be fatal to the patient's cause of action.

¶ 24 *Atienza v. Taub*, 194 Cal.App.3d 388, 239 Cal.Rptr. 454, 455, 457, surveyed the existing body of law in this area and concluded:

> This appeal presents a question of first impression: can allegations that a physician initiated a sexual relationship with his patient during the time he was treating her for a physical disorder state a cause of action for professional negligence medical malpractice? In our view, the answer turns on whether the sexual relationship was initiated by the physician under the guise of treatment of the patient.
>
> . . . .
>
> In examining out-of-state authorities, we find that allegations of a physician's sexual misconduct have provided a basis for a malpractice action only where the patient has alleged that the physician induced sexual relations as part of the therapy. (*Zipkin v. Freeman* (Mo.1968) 436 S.W.2d 753, 755 [psychiatrist "negligently advised plaintiff she needed further treatment by way of personal and social contacts with him even though such a relationship went beyond accepted psychiatric standards."]; *Roy v. Hartogs* (1976) 85 Misc.2d 891, 381 N.Y.S.2d 587, 588 [plaintiff "induced to have sexual intercourse with the defendant as part of her prescribed [psychiatric] therapy."]; *Cotton v. Kambly* (1980) 101 Mich.App. 537, 300 N.W.2d 627, 628 ["Plaintiff alleges that defendant induced her to engage in sexual relations with him as part of her prescribed therapy."].) Under these circumstances, the courts "see no reason for distinguishing between this type of malpractice and others, such as improper administration of a drug or a defective operation. In each situation, the essence of the claim is the doctor's departure from proper standards of medical practice." (*Cotton v. Kambly, supra*, 300 N.W.2d at pp. 628–629.)

The relevant authorities therefore agree that a physician who induces a patient to enter into sexual relations is liable for professional negligence only if the physician engaged in the sexual conduct on the pretext that it was a necessary part of the treatment for which the patient has sought out the physician.

### Category Three—Transference Induced and Mishandled by Non–Psychologist Physician

¶ 25 The final category of cases borrows from the body of law dealing with psychological treatment and the transference phenomenon. As discussed briefly above, a psychologist, psychiatrist, or other professional mental health care provider is often the target of a patient's transference. Failure to properly handle that recognized mental health occurrence is actionable in those cases, because failure to employ techniques of counter transference falls below the accepted standard of care. Although transference is generally not recognized as a medical issue, there are reported cases in which a medical physician who was not a psychiatrist or psychologist, nevertheless provided such ad hoc counseling and emotional support as to have effectively taken on the role of a mental heath care professional, and failed to properly handle the resulting transference phenomenon.

¶ 26 The court in *McCracken v. Walls–Kaufman*, 717 A.2d 346, 352–53 (D.C.1998), held:

> We hold that if a medical professional not practicing in the field of mental health enters into a relationship of trust and confidence with a patient and offers counseling on personal matters to that patient, thus taking on a role similar to that of a psychiatrist or psychologist, that professional should be bound by the same standards as would bind a psychiatrist or psychologist in a similar situation. *See Dillon, supra*, 609 N.E.2d at 428 (physician who acted as patient's therapist, even though "not a practicing psychiatrist," was appropriately held to standard of therapist); *Shamloo v. Lifespring, Inc.*, 713 F.Supp. 14, 17 (D.D.C.1989) ("[District of Columbia] case law does not hold that an unlicensed purveyor of 'professional' psychological services should be afforded greater protection from claims of negligence or malpractice than a licensed

one."); *cf. Correll v. Goodfellow,* 255 Iowa 1237, 125 N.W.2d 745, 749 (1964) (chiropractor held to standard of care of medical doctor when he left realm of standard chiropractic techniques by administering ultra-sonic treatments to a patient's foot).

Therefore, as a medical professional, Dr. Walls–Kaufman can be found liable in tort for medical malpractice if it is found that he engaged in sexual acts with his patient, Mrs. McCracken, and if the McCrackens have established the following: that in the course of Dr. Walls–Kaufman's chiropractic treatment of Mrs. McCracken, a relationship similar to a psychologist-patient relationship developed between the two; that it was a breach of the applicable standard of care for Dr. Walls–Kaufman to engage in sexual acts with Mrs. McCracken during the course of or attendant to that relationship; and that the breach of the standard of care by Dr. Walls–Kaufman proximately caused Mrs. McCracken's claimed injuries. (Footnotes omitted.) Because in actions for medical malpractice issues such as the applicable standard of care and causation are not "within the ken of the average lay juror," appellants will be required to establish them through expert testimony.

¶ 27 The court in *Simmons v. United States* (9th Cir.1986), 805 F.2d 1363, 1366, put it this way:

The crucial factor in the therapist-patient relationship which leads to the imposition of legal liability for conduct which arguably is no more exploitative of a patient than sexual involvement of a lawyer with a client, a priest or minister with a parishioner, or a gynecologist with a patient is that lawyers, ministers and gynecologists do not offer a course of treatment and counseling predicated upon handling the transference phenomenon. *See* A. Stone, M.D., *Law, Psychiatry, and Morality* 199 (1984).

¶ 28 As the Oklahoma Supreme Court in *Bladen v. First Presbyterian Church,* 1993 OK 105, ¶ 17, 857 P.2d 789, 794, recognizes:

Thus, claims for negligence against psychologists, psychiatrists, and therapists are based upon a mishandling of a specific tool

[transference/counter-transference] used by those professionals in the course of treatment, and the departure from the professional norm is regarded as a type of malpractice for those professionals. This analysis suggests that professionals who do not use the transference mechanism are not subject to the same claim of counseling malpractice arising from the consensual sexual conduct of adults unless the conduct violates some other professional standard of conduct.

¶ 29 *Bladen* quotes at length, and with apparent approval, many of the authorities we have cited above which discuss a therapist's mishandling of the transference phenomenon. *Bladen* did not present the court with the issue now before us, and therefore the court did not directly address the question of whether a doctor who provided such ad-hoc counseling and emotional support so as to have effectively taken on the role of a mental heath care professional, and who failed to properly handle the resulting transference phenomenon, may be liable for any resulting damages. However, we conclude that because *Bladen* recognizes that a cause of action arises from the "mishandling of a specific tool used by [mental health] professionals in the course of treatment," that if presented with facts that proved that tool was wielded and mishandled not by a psychologist, psychiatrist, or other therapist, but by a general practitioner who, through his actions effectively took on the role of a mental health care provider, that courts of this state would recognize a cause of action.

## Application to Case at Bar

¶ 30 Having established what is and what is not actionable in this state, we now turn to the specific propositions of error raised by Patient. Patient's first proposition is that the trial court erred when it permitted evidence and testimony to be presented to the jury that allegedly effectively relitigated the issue of whether a physician-patient relationship existed, despite the Board's earlier finding, and Doctor's admission that it did exist. We find this to be without merit because the existence of the doctor-patient relationship was stipulated and was not subject

to relitigation. As set out above, Doctor admitted having sexual contact with Patient, and admitted to remaining Patient's primary physician at the time. However, the validity of Doctor's defense—that he was not treating Patient for her psychological problems, or that this was merely consensual sexual contact between two adults, was a question of fact for the jury. As set out above, there must be a causal connection between the doctor-patient sex act and Patient's damages and, as we have determined, that connection is treatment. Just as Patient should be permitted to introduce evidence proving treatment took place, so should Doctor be allowed to introduce evidence that no treatment took place.

¶ 31 Patient's next proposition of error is that the trial court erred in giving Jury Instruction No. 11, which reads as follows:

You are instructed that Martin Davis, D.O., has admitted that he engaged in sexual activity within the physician/patient relationship. However, the ultimate issue of treatment at the time of the sexual encounters is for your consideration and decision.

¶ 32 Patient objected to the instruction on the basis that the issue of sexual conduct within a physician-patient relationship was already established, and thus the issue was precluded. Patient objected that the "meaningless" distinction between the "physician-patient" relationship and "treatment" rendered the instruction infirm. It is important to note that this is the only instruction which purports to address the circumstances under which a physician may be liable for sexual relations with the patient.

### Standard of Review of Jury Instructions

■ ¶ 33 We review given or refused jury instructions to determine whether there is a probability the jurors were misled thereby and reached a different conclusion than they would have reached but for the questioned instruction, or whether there was excluded from consideration a proper issue of the case. *Ankney v. Hall,* 1988 OK 101, 764 P.2d 153; *Woodall v. Chandler Material Co.,* 1986 OK 4, 716 P.2d 652; *Van Wart v. Cook,* 1976 OK CIV APP 39, 557 P.2d 1161.

■ ¶ 34 Based upon our analysis above, we hold the trial court's instruction was proper in charging the jury with the task of ascertaining whether treatment occurred. We reverse the case, however, and remand for a new trial because we hold, based upon the evidence set out below, that neither this instruction, nor any other instructions, sufficiently instructed the jury regarding the circumstances under which the Defendant could be liable for negligence. The court's instructions failed to adequately apprize the jury that the Defendant could be liable (1) if he incorporated sexual conduct with the patient as a purported treatment modality, or (2) he, in effect, took on the role of a psychologist-psychiatrist giving rise to a possible transference phenomenon.

¶ 35 In this connection, the record reflects Doctor admitted at trial that:

Well, my role as physician really changed with her. As I said, I became more of a confidante. I became more of a sounding board for everything that was going on. So, you know, I left my role, which was totally wrong, as a physician, and became personal with her.

He later stated:

A. As I said, I took on the role of being closer to her.

Q. Now, how many other patients did you have that you decided to take on a different role with at that time?

A. At that time?

Q. Yes, sir.

A. None.

¶ 36 We conclude that evidence at trial suggested that despite Doctor's referral to a psychiatrist to handle Patient's emotional and psychological problems, and despite his continued encouragement of Patient to continue to seek psychological counseling, a jury could find that Doctor's admitted role of "confidante," "friend," and "sounding board" was of such a nature that Patient could have interacted with Doctor not only as a medical care provider, but as a psychotherapist as well. This possibility was recognized by Doctor when he testified that as early as March 1992, he discussed the concept of

transference with Patient, and knew that he should have terminated the doctor-patient relationship, but chose not to do so.

¶ 37 Nothing herein should or can be interpreted to obviate Patient's burden of proof. In order to prevail on her claim, Patient must overcome the defenses of consensual sex and the termination of the doctor-patient relationship prior to the sex act, and affirmatively prove the existence of a doctor-patient relationship and that a sexual encounter took place because it was either represented to be part of the medical treatment regimen, or the medical physician took on the role of a de facto psychotherapist or other mental health care provider and failed to properly handle the transference phenomenon, as evidenced by the sexual contact. Such contact may constitute delivery of substandard medical care and may render the doctor liable in tort:

> [I]f a medical professional not practicing in the field of mental health enters into a relationship of trust and confidence with a patient and offers counseling on personal matters to that patient, thus taking on a role similar to that of a psychiatrist or psychologist, that professional should be bound by the same standards as would bind a psychiatrist or psychologist in a similar situation.

*McCracken v. Walls–Kaufman,* 717 A.2d 346, 352 (D.C.1998).

¶ 38 Reviewing the instructions given to the jury, we note the trial court correctly recognized that the issue of treatment was raised by the evidence, and correctly submitted a jury instruction that mentioned treatment. But that instruction was vague and not adequate to explain the necessity that sexual conduct be made a part of treatment to render Doctor liable. Further, the instructions did not address the issue of whether Doctor took on the role of a therapist, thus giving rise to the transference phenomenon, which he then failed to properly handle, therefore providing substandard care.

¶ 39 Oklahoma law imposes a duty on the trial court to instruct upon the decisive issues of the case as supported by the pleadings and evidence introduced. *See, e.g.,*

*Bradley Chevrolet, Inc. v. Goodson,* 1969 OK 25, 450 P.2d 500; *Vogel v. Rushing,* 1949 OK 275, 212 P.2d 665. This is so even though the particular issue may not have been specifically alleged by the party prior to trial. *Timmons v. Royal Globe Ins. Co.,* 1982 OK 97, 653 P.2d 907. If this were not true, a plaintiff could control the court's instructions by the allegations of his pleadings, regardless of whether or not they were ever supported by evidence. *Williams v. Wilson,* 1962 OK 33, 368 P.2d 992. Failure to so instruct is grounds for a new trial. *LPCX Corp. v. Faulkner,* 1991 OK 46, 818 P.2d 431; *Young v. First State Bank,* 1981 OK 53, 628 P.2d 707.

¶ 40 We therefore reverse the trial court's March 13, 2000, judgment and remand the matter for a new trial.

¶ 41 REVERSED AND REMANDED FOR NEW TRIAL.

STUBBLEFIELD, J. (sitting by designation), concurs, and RAPP, J., concurs specially.

RAPP, J., specially concurring.

¶ 1 While I am in agreement with the majority, I must also note that Plaintiff's counsel here erred in failing to properly frame the issues for the trial court and submit for its consideration requested instructions identifying and framing the issues for the jury, which this court has been required to do. Plaintiff's counsel has, in effect, been given a second chance here because he failed to identify the issue resulting in fundamental error in the trial of this matter.